**CLARK OIL PRODUCING CO.**

v.

**Donald P. HODEL, etc., et al.**

**Civ. A. No. 86–2463.**

United States District Court,
E.D. Louisiana.

Aug. 17, 1987.

282

Courtenay, Forstall, Grace & Hebert, Terrence C. Forstall, New Orleans, La., Crowell & Moring, Washington, D.C., for Clark Oil.

Michael E. Coney, New Orleans, La., for Shell Offshore Inc.; Hogan & Hartson, Mary Anne Sullivan, Washington, D.C., Joseph C. Bell, by pro hoc vice, of counsel.

F. Henry Habicht II, Asst. Atty. Gen., John Volz, U.S. Atty., S. Mark Gallinghouse, Asst. U.S. Atty., New Orleans, La., Dept. of Justice, Land & Natural Resources Div., Lisa Hemmer, Trial Atty., Washington, D.C., for Donald Hodel; L. Poe Leggett, Christina K. Navarro, Office of the Solicitor, Dept. of Interior, Washington, D.C., of counsel.

## ORDER and REASONS

LIVAUDAIS, District Judge.

Clark Oil Producing Company (Clark) has filed a complaint against the Secretary of the Interior claiming that a decision by the Department of the Interior (DOI) is improper and for various reasons should be reversed. Shell Oil Company (Shell) has intervened to assert its rights under the decision of the DOI and has also filed a claim against the Secretary claiming the Secretary failed to award Shell the proper rate of interest on the amounts owed by Clark to Shell under the decision of the DOI.

Clark, Shell, and the DOI have all filed motions for summary judgment contending that there exist no issues of material fact and that judgment should be entered as a matter of law in accordance with F.R.C.P. 56.

For the following reasons, IT IS ORDERED that:

1) Motion for summary judgment on behalf of defendant, Donald P. Hodel, Secretary of the Interior, is hereby GRANTED;

2) Motion for summary judgment on behalf of Intervenor, Shell Offshore, Inc. be GRANTED IN PART and DENIED IN PART;

3) The cross-claim of Shell Offshore, Inc. against the Secretary of the Interior is hereby DISMISSED; and

4) Motion for summary judgment on behalf of Clark Oil Producing Co. is hereby DENIED.

## PROCEDURAL HISTORY

In 1971, the United States Geological Survey (USGS) issued two oil and gas leases in the Gulf of Mexico, Vermillion Blocks 320 and 321.[1]

Sun Oil Company (Sun), comprised of six separate companies, one of which is Clark, was issued oil and gas lease OCS–G–2087 in Block 320. At this time, Clark was a 15 percent working interest owner in this lease. Shell was issued oil and gas lease OCS–G–2088 in Block 321, a lease on lands adjacent to the land subject to the Sun lease. In May of 1971, Sun and Shell entered into a cooperative exploratory drilling program. However, in 1973 Sun and Shell began to develop their leases independently.

On September 24, 1974, the Area Oil and Gas Supervisor of the USGS made a preliminary determination that Sun's and Shell's leases overlay a single competitive reservoir, as defined in OCS Order No. 11. Administrative Record (hereinafter A.R.) 8.[2] The USGS informed both lessees of this preliminary determination and asked for their views with supporting engineering and reservoir data.

The Supervisor issued a final determination that the "P" Sands reservoir[3] is competitive on May 2, 1975, and requested that the parties submit plans for joint development and production of the reservoir in accordance with OCS Order No. 11. A.R. 16. Sun did not appeal the competitive reservoir determination. On July 31, 1975, Shell requested the Conservation Manager to unitize the lease interests overlying the "P" Sands reservoir on the basis that the reservoir was adequately developed. A.R. 17.[4]

---

1. The responsibilities of the USGS (which included the implementation of the Outer Continental Shelf Lands Act) were transferred by Secretarial Order No. 3071 to the Mineral Management Survey (MMS). 47 Fed.Reg. 4751 (Feb. 2, 1982).

2. The entirety of the Administrative Record has been filed into the record of the present proceedings.

3. The "P Sands" refers to the common gas-bearing sands, issue of this law suit.

4. "Unitization" refers to the consolidation of separately owned lease interests for the joint

On September 9, 1975, the USGS conducted a joint conference with participants from Sun and Shell, allowing both parties to submit data and analysis to enable USGS to determine "whether unitization is necessary." A.R. 18. Both parties submitted geological and technical data at the conference, and supplemented their submissions afterwards. A.R. 20–26.

On the basis of the parties' submittals, the USGS Conservation Manager ordered the parties to unitize the "P" Sand reservoir on November 10, 1975. A.R. 27. He explained:

> Substantial evidence has been presented which supports a determination that unitization is necessary. The balancing of production from this competitive reservoir under a joint production plan would require the curtailment of production from Sun's tract thereby reducing overall reservoir withdrawal rates in order for each operator to realize his proportionate share of total production from existing wells. The P/Z vs cumulative production plot and the existing exploratory and development wells support the finding that the reservoir is common to both leases and that the reservoir is reasonably delineated. In order for Shell Oil Company to produce at rates which would allow it to recover a proportionate share of remaining hydrocarbons, Sun Oil Company must either reduce its withdrawal rates or Shell Oil Company must drill additional wells.

*Id.* at 2–3.

The Conservation Manager concluded:

> Based on all information available, it is determined that unitization is necessary to best serve the interest of conservation, to prevent the drilling of unnecessary wells, to increase ultimate recovery, and to protect the correlative rights of the parties involved in the common reservoir.

*Id.* at 1. He ordered Sun and Shell to negotiate and submit a proposed unit plan for designation of the unit area within 6 months.

exploration or development of a hydrocarbon reservoir under the terms of a unit agreement.

On December 5, 1975, the Sun group appealed the unit order to the Director of USGS, on behalf of all co-owners of the Sun lease, including Clark. Sun claimed that the P Sand was not a competitive reservoir and was not capable of reservoir delineation. A.R. 30.

In December 1975, the Conservation Division of the USGS analyzed again the competitive reservoir determination on the basis of Sun's challenge. The Conservation Division's analysis of production and mapping showed that the reservoir is competitive. *Id.* at p. 1. However, the USGS did not resolve Sun's appeal of the unit order at that time. On February 20, 1976, the Director informed the parties that during the pendency of Sun's appeal, the parties would be obligated to comply with the unit order. A.R. 40. Accordingly, the parties proceeded to negotiate a unit agreement.

In February 1977, when it became clear that the parties could not agree to the terms of a unit, the USGS sent a proposed unit agreement to the parties and requested comments. On March 23, 1977, the USGS sent a final unit agreement order to the parties. A.R. 71. The order attached the unit agreement to be signed by the parties, A.R. 72, which set forth the formula by which production of natural gas from the reservoir would be allocated between the lessees. A.R. 72.

The formula was based on two factors: net acre-feet of natural gas-bearing sands underlying each lease and the relative production from both leases during a six-month period from January 1 through June 30, 1976. The USGS gave production a 36 percent weight and gave net acre-feet a 64 percent weight, based on the difference between the parties' percentages of total production and of net acre-feet of gas underlying their leases. Accordingly, the USGS ordered the parties to participate in production on the following basis: Shell's unit participation was 68.14 percent and Sun's was 31.86 percent.

30 C.F.R. § 250.2(jjj) (1986).

The unit agreement order also required the parties to enter into a private joint operating agreement, and to subscribe to and operate under the unit agreement. Sun and Shell prepared and signed a joint operating agreement in May 1977. Sun signed under protest.

### Appeals to the Director of the USGS

Sun appealed the 1977 unit agreement order to the Director of the USGS and requested a stay of compliance with the order. A.R. 77. The USGS denied the stay, A.R. 88, and Sun filed a notice of appeal of that decision to the Interior Board of Land Appeals (hereinafter "IBLA"). A.R. 89. The USGS reexamined the stay issue and, on May 10, 1977, stayed the effectiveness of the Conservation Manager's November 10, 1975 and March 23, 1977 Orders. A.R. 97. Accordingly, the IBLA dismissed Sun's appeal of the USGS's denial of Sun's request for a stay. A.R. 100.

In its appeal to the director of the USGS, Sun did not argue that the reservoir in question was not competitive (as it argued in their initial appeal). Instead, Sun argued that in accordance with applicable statute and rule, the USGS only had the authority to force unitization in the interest of conservation in accordance with 43 U.S.C. § 1334(a)[5] and 30 C.F.R. § 250.50 (1975)).[6] Further, that the term "conservation" in these provisions means conservation of mineral resources (oil and gas) and nothing else. Sun's position in their appeal was that the USGS in their November 10, 1975 order of unitization, did not make the necessary finding that unitization was in the interest of conservation and therefore, said order of unitization is unlawful.

On February 7, 1979, the Director issued a decision affirming the unitization orders. A.R. 141. He found that "unitization prevented the drilling of unnecessary wells and was in the interest of conservation." A.R. 141, p. 7. The Director explained:

> An order requiring unitization to prevent the drilling of an unnecessary well furthers the interest of conservation because well drilling and completion operations are a potential source of pollution. In addition, the drilling of an unnecessary well entails the diversion of scarce drilling equipment and expert manpower from more productive uses. Potentially adverse effects of separate operations can be avoided only by careful scrutiny of each drilling application.

*Id.* at p. 5. The Director found that Shell intended to drill additional wells in order to compete with Sun's production, and that permission to do so had been denied informally by USGS. *Id.* at p. 7. "[A] sufficient number of wells already had been drilled to drain the reservoir" and additional wells would have been unnecessary because they would not have increased overall production. *Id.* at 7.

Likewise, the Director upheld the formula for allocation of production. He stated:

> The participation formula fashioned by the Conservation Manager gives weight to the original proven reserves underlying each lease along with the ability of the wells to sustain efficient reservoir depletion. While other rational allocation methods could be devised, the formula chosen by the Conservation Manager fairly allocates unit production. Accordingly the formula will be upheld.

*Id.* at 9.

Sun filed a Notice of Appeal to the IBLA and a Motion for Reconsideration to the

---

**5.** Prior to the 1978 amendments, 43 U.S.C. § 1334(a)(1) read: The Secretary shall administer the provisions of this Act relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding, any other provisions herein....

**6.** 30 C.F.R. § 250.50 (1975) reads:

Section 5(a)(1) of the act authorizes the Secretary in the interest of conservation to provide for unitization, pooling and drilling agreements. Such agreements may be initiated by lessees or where in the interest of conservation they are deemed necessary they may be required by the Director.

Director. A.R. 146. Shell filed a motion to supplement decision supporting the Director's decision. Because the parties' motions had now been filed before two administrative bodies, the Office of the Solicitor, Department of the Interior, filed with the IBLA a Motion for Remand to the Director of USGS, so that the Director could consider the new argument and information in Sun's Motion for Reconsideration and Shell's Motion to Supplement. A.R. 167. On August 23, 1979, the IBLA set aside the decision appealed from and remanded the case to the Director for further consideration of the compulsory unitization issues. A.R. 205. *Sun Oil Co.*, 42 IBLA 254, 259.

On June 5, 1981, the Director of the USGS issued a decision on remand affirming the decision of the USGS to require unitization. A.R. 228. The Director set forth a statement of "questions presented":

1. For what purpose could the Conservation Manager require unitization under the outer Continental Shelf Lands Act before its amendment in 1978?

2. Was the Conservation Manager's unitization order arbitrary, capricious, or contrary to law?

3. Should the Conservation Manager's production allocation formula be upheld?

*Id.* at 4.

After examining the regulations in effect in 1975, 30 C.F.R. § 250.50, the Director found that the Conservation Manager was reasonable in ordering unitization to prevent the drilling of unnecessary wells because that goal furthers the interest of conservation.

An order requiring unitization to prevent the drilling of an unnecessary well furthers the interest of conservation because well drilling and completion operations disturb marine life and are a potential source of pollution. Potentially adverse cumulative effects of separate operations on natural resources can be reduced or eliminated by minimizing the total number of wells drilled on different leases.

*Id.* at 5.

The Director rejected Sun's argument that the Conservation Manager should have based his decision on a specific finding of harm from a specific well Shell might have drilled. The Director explained:

It can be argued that the prevention of the drilling of one additional well does not eliminate a risk to the resources of the OCS so as to constitute a significant conservation purpose. This argument cannot be accepted. There would be no merit to a dispute as to how many unnecessary wells constitute too many. Suffice it to say that the prevention of drilling of one unnecessary well avoids an unnecessary risk to natural resources and constitutes conservation of such resources so as to justify unitization.

*Id.* at 7.

In response to Sun's challenge to the Conservation Manager's production allocation formula, the Director stated:

Among the many variables which may be used to create an allocation formula, two of the generally recognized variables are (1) oil initially in place beneath a tract and (2) well productivity (§ 970.1, *Oil and Gas Law*, Williams and Myers). An allocation formula which synthesizes these two commonly utilized variables and recognizes both Sun's and Shell's rights to an equitable portion of the gas in the reservoir, is eminently reasonable. The unit production allocation formula proposed by Sun takes into account production as well as the original reserves underlying each lease. The Conservation Manager chose a formula which was likewise based on production and original reserves. The production figure chosen by the Conservation Manager was based on reservoir production during the period January 1976 through June 30, 1976. This span of time represented a 6-month period during which Sun and Shell had been expected to negotiate a unit agreement. This interval was also considered to be representative of reservoir produc-

tion since the wells developed by both lessees were then in production. To recapitulate, the participation formula fashioned by the Conservation Manager gives weight to the original proven reserves underlying each lease along with the ability of the wells to sustain efficient reservoir depletion. While other rational allocation methods could be devised, the formula chosen by the Conservation Manager fairly allocates unit production. Accordingly, the formula is upheld.

*Id.* at 8.

### First Appeal to the IBLA

On the basis of the Director's Decision, Shell requested certification of the unit order. A.R. 231. Sun appealed the Director's decision to the IBLA and requested a stay pending appeal. A.R. 233. On July 31, 1981, the IBLA granted Sun's request for a stay. A.R. 244, *Sun Oil Co.*, IBLA 81–833.

On September 9, 1982, the IBLA issued its decision upholding the Conservation Manager's unit order. A.R. 256, *Sun Oil Co.*, 67 IBLA 80 (1982). The IBLA noted that under regulations enacted after the 1978 Amendments to the OCSLA, unitization was proper because "[t]he record leaves no doubt that Shell's correlative rights to the 'P' sands were threatened by Sun's production." *Id.* at 83. But it specifically addressed the question of whether unitization was proper under the statute and regulations in existence in 1975.

However, the provisions of the OCS Act in effect *prior* to the 1978 amendments simply allowed the Secretary, in his discretion, to prescribe such regulations as he determined to be necessary to provide for the prevention of waste and conservation of OCS natural resources and correlative rights therein. *No* regulation authorizing compulsory unitization to *protect correlative* rights was in place in 1975. Compulsory unitization, pooling, and drilling agreements were authorized only "in the interest of conservation." 30 C.F.R. 250.50 (1975).

*Id.* at 67 IBLA 83–84 (emphasis in original). The IBLA then concluded that the Conservation Manager's decision to unitize was in the interest of conservation.

It reasonably appeared to the Conservation Manager in November 1975, that drilling even one additional well would be unnecessary (except to protect Shell's correlative rights), and a waste of critical, expensive offshore drilling resources; that it would present a potential for adverse environmental consequences; and that additional drilling would not increase ultimate recovery. Unitization provided Shell an alternative to drilling an additional well or wells to protect its correlative rights, by allowing the parties to negotiate an agreement fairly allocating production. Thus, even though the unitization order had the ancillary effect of protecting Shell's correlative rights, it also served the interest of conservation by removing Shell's motivation to drill an unnecessary well or wells and so avoided unnecessary expense and environmental risk. We conclude that the Conservation Manager's decision to require unitization was a proper exercise of his regulatory authority.

*Id.* at 84.

In responding to Sun's challenge to the propriety of the allocation order, however, the IBLA noted that the Sun/Shell production diverged from the division of reservoir volume. *Id.* at 85. Accordingly, in order to assure that the formula was reasonable and based on an explained record, the IBLA referred the matter to the Hearings Division for the appointment of an Administrative Law Judge (ALJ). *Id.* The IBLA ordered the ALJ to convene a hearing:

for the presentation of evidence concerning the distribution of gas-in-place in the "P" sands. Sun, the party challenging the accuracy of the [US]GS's 81.1/18.9 percent division shall have the burden of showing by persuasive evidence that it is incorrect. ... The allocation formula imposed by [US]GS relies in large part on the 81.1/18.9 percent division and may therefore be altered. Further, we are unable to determine the basis for the 36 percent "weighting factor" used by

[US]GS to recognize Sun's production in allocating production. The parties may also wish to present evidence concerning whether or not this factor is arbitrary. *Id.* at 85–86.

### The Hearing Before the ALJ

On September 14, 1982 the file was transferred to Administrative Law Judge Rampton for a factual hearing on the nature of the "P" Sands reservoir. A.R. 257. During the briefing and submission of evidence by the parties, Shell requested the Chief Administrative Judge of the IBLA to rule on Shell's claim for interest pending the stay, as it had not done so in its 1982 decision. A.R. 268. In response the IBLA referred the question of interest to ALJ Rampton. A.R. 269. The ALJ upheld the allocation adopted by the USGS and awarded Shell interest on the amount owed to it at a rate of seven percent.

### The IBLA's Final Decision

Both parties appealed the ALJ's decision. Shell appealed the interest award of seven percent and Sun appealed the decision in total. Subsequently, two members of the Sun Group, Petro Lewis and Diamond Shamrock settled with Shell and voluntarily dismissed their appeals. This left Shell with ony one adversary, namely Clark. On February 28, 1986, the IBLA issued its final decision, *Sun Oil Co.*, 91 IBLA 1 (1986). A.R. 322.

On March 26, 1986, the MMS informed Shell and the remaining Sun members that the "decision by the Board constitutes the final resolution of this matter within the United States Department of the Interior." A.R. 325, at 1. The MMS also revised the allocation formula on the basis of the IBLA's direction. *Id.* at 1–2. As a result of the recalculation, Shell's unit participation is 67.6975 percent and Sun's is 32.-3025 percent.

In its appeal to this court, Clark asserts three claims: 1) The MMS/USGS had no authority to unitize the leases at issue; 2) The allocation formula adopted by the MMS/USGS is arbitrary and capricious; and 3) Shell is not entitled to interest for

the period during with Sun's/Clark's obligation to Shell was stayed pending final resolution.

### JURISDICTION

The decision of the IBLA is the Secretary's final decision within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704. This Court is vested with jurisdiction pursuant to 43 U.S.C. § 1349 and 28 U.S.C. § 1331.

### CLARK'S CLAIM OF UNLAWFUL UNITIZATION

On November 10, 1975, the USGS Conservation Manager ordered unitization finding:

Based on all the information available, it is determined that unitization is necessary to best serve the interest of conservation, to prevent the drilling of unnecessary wells, to increase ultimate recovery, and to protect the correlative rights of the parties involved in the common reservoir ...

... Evidence shows that sufficient drainage points now exist to effectively and economically drain the "P" Sand reservoir. Additional drilling would not increase ultimate recovery and would constitute economic waste.

Clark contends that this order of unitization is unlawful because in accordance with the law as it existed in 1975, unitization could only be ordered if it were determined to be "in the interest of conservation" and because the Conservation Manager's order did not contain the required evidence that unitization was necessary for conservation, said order is invalid. Secondly, Clark argues that "conservation" in the context of unitization refers exclusively to conserving the greatest ultimate recovery of oil and gas and since unitization did not increase ultimate gas recovery, the order of unitization is invalid for this reason also. Thirdly, Clark argues that the term used by the Conservation Manager "economic waste" is not to be considered as a factor in determining whether unitization is proper. Finally, Clark argues that the claim that unitization served conservation by reducing

environmental risks is legally defective and the Interior did not and could not present the necessary record for concluding that unitization was needed to reduce environmental risks.

In section 5(a) of the Outer Continental Shelf Lands Act, (OCSLA), *as amended* in 1978, 43 U.S.C. § 1334(a)(4) Congress directed the Secretary to adopt regulatory provisions, *inter alia,* for unitization in order to provide for the prevention of waste and conservation of the natural resources on the outer continental shelf, (OCS), and in order to provide for the protection of correlative rights therein. The provisions of OCSLA in effect prior to the 1978 amendments allowed the secretary to prescribe regulations as he determined to be necessary to provide for the prevention of waste and conservation of OCS natural resources and correlative rights therein. However, in 1975 when the USGS ordered unitization of the Shell and Sun leases, compulsory unitization was authorized only "in the interest of conservation." 30 C.F.R. § 250.50 (1975).

In essence Clark is reiterating the arguments it made on appeal to the IBLA. These arguments, alleging impropriety of the USGS's November 10, 1975 order of unitization, were considered in depth by the USGS and the IBLA. A review of the Administrative Record shows conflicting views as to the propriety in and authority for the November 10, 1975 order of unitization.

With the conflicting views in front of it, the IBLA concluded in 1982:

> From the Conservation Manager's viewpoint in November 1975, unitization was properly seen to be in the interest of conservation. The wells completed at that time were, by themselves, adequate to achieve full recovery of natural gas from the reservoir. However, as many as seven additional producing wells could have been drilled into the reservoir without *decreasing* full recovery, due to the presence of a 'slight' water drive in the reservoir, although the additional wells would not *increase* ultimate gas recovery. Further, in July 1975 Shell had

asked the Conservation Manager to unitize or, alternatively, to grant it permission to drill a number of additional wells in order to counter Sun's alleged overproduction of gas-in-place under Shell's lease. The Conservation Manager had no basis to deny it permission to do so in light of the reservoir's tolerance to additional wells.

> Thus, the drilling of additional wells appeared to be a real possibility.

> It reasonably appeared to the Conservation Manager in November 1975 that drilling even one additional well would be unnecessary (except to protect Shell's correlative rights), and a waste of critical, expensive offshore drilling resources; that it would present a potential for adverse environmental consequences; and that additional drilling would not increase ultimate recovery. Unitization provided Shell an alternative to drilling an additional well or wells to protect its correlative rights, by allowing the parties to negotiate an agreement fairly allocating production. Thus, even though the unitization order had the ancillary effect of protecting Shell's correlative rights, it also served the interest of conservation by removing Shell's motivation to drill an unnecessary well or wells and so avoided unnecessary expense and environmental risk. We conclude that the Conservation Manager's decision to require unitization was a proper exercise of his regulatory authority.

67 IBLA 84 (A.R. 256).

It is clear that the Department of the Interior had interpreted the term "in the interest of conservation" in a broad sense to encompass the protection of the environment long before the 1975 order of unitization (See Memo of Solicitor, dated July 21, 1971. A.R. 87). Additionally there existed case law interpreting the phrase "in the interest of conservation" to encompass all the natural resources of the outer continental shelf, not only the mineral resources. See *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786 (1978), *Union Oil Company of California v. Morton*, 512

F.2d 743 (9th Cir.1975), *Gulf Oil Corp. v. Morton,* 493 F.2d 141 (9th Cir.1974).

As stated in *Union Oil,* "[t]he Secretary is responsible for conserving marine life, recreational potential, and aesthetic values, as well as the resources of gas and oil" *Id.* at 749.

■ Courts are required to give deference to a reasonable interpretation of a statute made by the agency charged with its administration. *United States v. City of Fulton,* 475 U.S. 657, 106 S.Ct. 1422, 1428, 89 L.Ed.2d 661 (1986). A court must give even greater deference to an agency's interpretation of its own administrative regulation than it would to an interpretation of a statute that the agency is charged with administering. *McDonald v. Watt,* 653 F.2d 1035, 1041 (5th Cir.1981), citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

■ Clark correctly points out that the judiciary is the final authority on issues of statutory interpretation and must reject administrative constructions which are contrary to clear congressional intent. However, if the statute is silent or ambiguous with respect to the specific issue, the question for the Court is whether the agency's answer is based on a permissible construction of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Further, the court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. *Id,* n. 11 (citations omitted).

■ A review of the record shows clear evidence that in absence of the 1975 order of unitization, Shell would have drilled additional wells on its lease.

For the foregoing reasons, I find that the Conservation Manager had the authority to order unitization as he did on November 10, 1975. I further find that the order of unitization was proper for it was reasonable for the IBLA to conclude that the prevention of the drilling of unnecessary wells was "in the interest of conservation" as contemplated by 43 U.S.C. § 1334 and 30 C.F.R. § 250.50.

Accordingly, I find that there exists no issue of material fact as to the propriety in and authority for the order of unitization. Accordingly, I GRANT summary judgment in favor of Shell and the Federal Defendant and against Clark, dismissing Count I of Clark's complaint.

### ALLOCATION FORMULA ADOPTED BY MMS/USGS

In Count II of its complaint, Clark claims that the formula adopted by the MMS/USGS allocating the production from the common reservoir between Shell and Clark is unlawful and arbitrary.

Specifically, Clark claims the formula: 1) is unlawful because it violates the rule of capture and Clark's correlative right to retain its gas production in "a fair opportunity to produce situation." (Memorandum of Clark on Cross Motions for Summary Judgment Record Document 50 at p. 34); 2) was calculated based on a six month period of production which is too short a period; and 3) contains a .36 weighting factor for production which lacks a rational basis and is contrary to the accepted Sun/Shell and industrial practice.

### RULE OF CAPTURE AND CORRELATIVE RIGHTS[7]

■ Clark argues that the allocation formula violates the law of capture and Clark's correlative right to retain its gas production. Clark fails to acknowledge that unitization is a mechanism created and designed to modify the law of capture and the correlative rights doctrine. In ordering unitization and determining a formula for allocation of production from the common

---

7. The "law of capture" refers to the principle that a landowner in a common source of supply is legally privileged to take oil and gas from his land even though in doing so, he may take some of the oil and gas from his neighbor's land.

OCS Order No. 11 defines correlative rights as "the opportunity afforded each lessee or operator to produce without waste his just and equitable share of oil and gas from a common source of supply".

reservoir, the Conservation Manager intended and was authorized to modify the law of capture and Clark's correlative rights. Although the concept of unitization is in conflict with the law of capture and correlative rights, this is not reason to prohibit or reverse the Conservation Manager's order of unitization. Accordingly, I find that Clark's claim that the Conservation Manager's order of unitization should be reversed because the allocation formula violates the law of capture and Clark's correlative rights lacks merit.

## SIX MONTH TEST PERIOD

■ The DOI gathered production data (in order to calculate the allocation formula) during a six month period prior to the order of unitization (January to June, 1976). Clark argues that the six month period was too short and therefore arbitrary. Clark urges this court to extend the period until 1977 or 1983 so that the formula would then award Clark for its "natural advantage" in its location over the reservoir. (Clark Summary Judgment memorandum Record Document # 41a at p. 39).

The six month period was a representative period of production after the unit was formed when all wells were operating. Clark suggests that this court extend the period past the point in time when Shell was prevented from drilling additional wells by the order of unitization. As was stated by Administrative Law Judge Rampton:

> Shell should not be penalized for its lack of production for it did not have an equal opportunity to produce. In reliance on the unitization order, the requested additional drilling was not done.

A.R. 300 at 44–45.

The IBLA agreed:

> As [the MMS] notes, Survey chose a period when all wells were in production. To have done otherwise, we think, would invite a finding of arbitrary action.

Paragraph 16 of OCS order No. 11 anticipates that once the Conservation Manager

determines that a reservoir is competitive, the parties are to negotiate a unitization agreement between themselves. As counsel for Shell points out, parties will be encouraged to negotiate in good faith and reach an agreement if they know that in case negotiations fail, the Conservation Manager will use the same information that was available to the parties during the negotiation period to force an unitization agreement upon the parties. Using the period prior to the entry of the final unit agreement furthers this policy.

Accordingly, I find that the six month period used by the Conservation Manager in determining the allocation formula is not arbitrary and that to extend the period past the time of the unitization order would be unfair to Shell and would make no sense.

## WEIGHT ASSIGNED PRODUCTION

■ Clark's claim that the 36 percent weight accorded production is arbitrary is also without merit. It was determined that Shell, with 81.1 percent of the reservoir net acre feet, produced 54.1 percent of the gas. The Sun Group, with 18.9 percent of the reservoir net acre feet, produced 54.9 percent of the gas.[8] The difference in each of these cases amounts to 36 percent which is the amount by which Sun overproduced and Shell underproduced their respective shares of the reservoir during the six month test period prior to the order of unitization.

> A court must be reluctant to reverse results supported by such a weight of considered and carefully articulated expert opinion. Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on engineering and scientific consideration, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.

**8.** The IBLA later reduced Shell's share of the gas in place from 81.1 percent to 79.6 percent to correspond to a recomputation.

*Federal Power Commission v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 644, 30 L.Ed.2d 600 (1972). I find that the allocation formula has a substantial basis in fact for the reasons stated above and therefore reject the claim by Clark that the 36 percent weighting factor is arbitrary.

Accordingly, I find that there exists no issue of fact as to the propriety of the allocation formula and GRANT summary judgment in favor of Shell and the Federal Defendant, dismissing Count II of Clark's complaint.

### INTEREST

■ In 1977 the Sun Group moved the Department to stay unitization pending Sun's administrative appeals. The Department granted the stay in 1977 and said stay has remained in effect ever since. Under the protection of the stay, Clark has been permitted to ignore the order of unitization, overproduce and keep the proceeds of the overproduction.

The IBLA found that an award of 7 percent interest to Shell was proper (91 IBLA 47 A.R. 322). Clark now claims that the Department was without authority to award such interest.

■ I find that the IBLA was correct in determining that it had the inherent authority to award interest. 91 IBLA at 51. Agencies possess equitable authority to award interest as a means of preventing unjust enrichment. *Skelly Oil Company v. FPC,* 401 F.2d 726, 729 (10th Cir.1968). Without an award of interest, Clark would enjoy substantial profit realized by its years of appeals. Such a windfall could also create an incentive in the future for parties to unduly prolong litigation. *Sun Oil Co.,* 91 IBLA at 50.

■ Shell seeks an award of interest at the rate of 12% basing its argument on the recent amendment to Art. 2000 of the Louisiana Civil Code (West Special Pamphlet 1986) which became effective July 3, 1985, raising the rate of interest from seven to twelve percent.

The use of state law to determine the interest due on Clark's obligation to Shell is authorized by section 4 of OCSLA, 43 U.S.C. § 1333(a)(2)(A) (1982). That section provides in part:

(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, . . . .

LSA–C.C. Art. 2000 changed Louisiana law insofar as it establishes that, when a rate of interest has not been agreed upon, the measure of damages for delay in performing an obligation to pay a sum of money shall be the legal rate of interest in force at the time the sum of money is due. LSA—C.C. art. 2000, comment (a) (West Special Pamphlet 1987).

Article XI of the joint operating agreement addressed the procedures to be followed to compensate Shell for the gas produced by Sun in excess of Sun's proportionate share. The pertinent provision states in part:

By way of compromise and settlement, this net over-production by Sun et al. will be settled by a cash payment to Shell for gas sold, gas processing plant liquids sold or taken in kind, and gas condensate recovered and sold in the field. Sun et al. will make said payment to Shell not less than thirty days after the effective date of this Joint Operating Agreement provided each party has access to all production records within ten days after said effective date.

■ I find that for the purpose of determining interest in accordance with LSA–C.C. art. 2000, Sun's [Clark's] obligation to pay Shell became due once the joint operating agreement became effective on May 5, 1977 and since the rate of interest in 1977 was seven percent, Clark is obligated to pay Shell interest on the obligation at the

rate of seven percent from May 5, 1977 until paid.

Accordingly, Shell's claim against the Federal Defendant alleging that interest is due at the rate of twelve percent is hereby DISMISSED. Additionally, motions for summary judgment on behalf of Shell and the Federal Defendant are hereby GRANTED, dismissing Count III of Clark's complaint.