925 F.2d 476
 288 U.S.App.D.C. 245
 CF INDUSTRIES, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION and United States of
America, Respondents,
Farmland Industries, Inc., Gulf Central Pipeline Company,
Gulf Central Storage and Terminal Company, Koch
Industries, Inc., IMC Fertilizer, Inc.,
Intervenors.
 No. 90-1180.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 4, 1991.
Decided Feb. 19, 1991.
 
 Petition for Review of an Order of the Federal Energy Regulatory Commission.
 Alfred Winchell Whittaker, with whom Katherine C. Zeitlin, Washington, D.C., was on the brief, for petitioner. Stephen A. Herman, Washington, D.C. also entered an appearance, for petitioner.
 Dwight C. Alpern, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondents. James F. Rill, Asst. Atty. Gen., John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., also entered appearances, for respondents.
 Steven H. Brose and Samuel M. Sipe, Jr., Washington, D.C. were on the brief, for intervenors Gulf Central Pipeline Co., Gulf Central Storage and Terminal Co., and Koch Industries, Inc.
 John M. Cleary and Frederic L. Wood, Washington, D.C. entered appearances, for intervenor Farmland Industries, Inc.
 Thomas F. McFarland, Jr. and Harold E. Spencer, Chicago, Ill. entered appearances, for intervenor IMC Fertilizer, Inc.
 Before RUTH B. GINSBURG, SILBERMAN, and THOMAS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 This case concerns which agency--FERC or the ICC--has jurisdiction to regulate rates charged for the transport of anhydrous ammonia by pipeline. Both FERC and the ICC agree that the authority is the ICC's. CF Industries believes otherwise, and petitions for review of a FERC order dismissing for lack of jurisdiction a complaint seeking refund of allegedly excessive pipeline rates. We deny the petition.
 
 I.
 
 2
 Anhydrous ammonia is an agricultural fertilizer derived from natural gas or petroleum refinery gas and transported by pipeline (among other means). Prior to 1977, the Interstate Commerce Commission was responsible for ensuring that rates charged for interstate pipeline transport of anhydrous ammonia were just and reasonable, as required by the Interstate Commerce Act, see 49 U.S.C. Sec. 10701.
 
 
 3
 The Department of Energy Organization Act of 1977, 42 U.S.C. Sec. 7101 et seq. ("DOE Act"), shifted regulatory jurisdiction over pipeline transportation of certain energy-related products from the ICC to the newly-created Department of Energy. See 42 U.S.C. Sec. 7155. The rates charged for pipeline transportation of these products were still to be subject to the provisions of the Interstate Commerce Act, but would be overseen by FERC instead of the ICC. See 42 U.S.C. Sec. 7172. Shortly thereafter, both FERC and the ICC moved, in a Seventh Circuit proceeding concerning rates charged for transport by pipeline of anhydrous ammonia, to substitute FERC for the ICC in the case caption on the ground that the DOE Act had transferred jurisdiction over these rates to FERC. The Seventh Circuit, in a brief, unpublished order not discussing the jurisdictional issue, granted the motion. See CF Industries v. FERC, No. 77-2150 (August 29, 1978).
 
 
 4
 For the next 12 years, FERC regulated anhydrous ammonia pipeline rates. In 1989, Farmland Industries, Inc., a shipper of anhydrous ammonia, filed a complaint with FERC alleging that Gulf Central Pipeline Company, the owner of an anhydrous ammonia pipeline, was charging unjust and unreasonable rates. CF, likewise a shipper of anhydrous ammonia, intervened in the proceeding. Gulf Central moved to dismiss on the ground that FERC lacks jurisdiction.
 
 
 5
 Six months later, FERC dismissed the complaint, holding that the DOE Act had not transferred jurisdiction over pipeline transport of anhydrous ammonia to it and that responsibility in this area remained with the ICC. See Gulf Central Pipeline Co., 50 FERC p 61,381, at 62,162 (March 20, 1990). FERC discounted its previous regulation of the transport of anhydrous ammonia because it had not "examined the jurisdictional issue"; it explained that this regulation was based instead upon the ICC's view that jurisdiction had in fact been transferred. Id. at 62,163. It then determined that the ICC was the responsible agency, reasoning that the DOE Act did not unambiguously give FERC the responsibility for regulating anhydrous ammonia pipeline rates and that it would be inappropriate to read the Act (in light of its emphasis on energy-related matters) as transferring that responsibility. Anhydrous ammonia has "few, if any, energy producing attributes" and "regulation of its transportation has no practical implication for energy matters." Id. at 62,163, 62,167.
 
 
 6
 Farmland then refiled its complaint with the ICC; CF intervened in that proceeding and also petitioned for review of the FERC order by this court. The ICC then issued a declaratory order reversing its previous position and finding that its jurisdiction does extend to the pipeline transportation of anhydrous ammonia, substantially for the reasons given by FERC. See Gulf Central Pipeline Co., 7 I.C.C.2d 52 (October 4, 1990). After oral argument, we requested supplemental briefs from the parties discussing whether CF has standing to seek review now that the ICC decision has assured that anhydrous ammonia pipeline rates will receive federal regulation.
 
 II.
 
 7
 At oral argument we gained the impression that petitioner CF Industries (unlike its competitor Farmland, which did not petition for review) wished FERC, rather than the ICC, to assert jurisdiction over Gulf Central Pipeline's transportation of anhydrous ammonia merely because FERC was perceived in some undefined way as the more "hard-nosed" regulator. We put to counsel the question whether this claim was brought by a third party beneficiary of regulation and not the regulated company itself which, without more, might not make out an Article III injury. We had previously reserved this issue. See National Wildlife Fed'n v. Hodel, 839 F.2d 694, 708 n. 9 (D.C.Cir.1988). After supplemental briefing, we see that petitioner as a shipper has as much right to challenge FERC's declination of jurisdiction as would the regulated company, see 49 U.S.C. Sec. 11705(b)(2) and (c)(1) (granting shippers private rights of action against common carriers).
 
 
 8
 Before 1977, the ICC was authorized to regulate rates charged for "[t]he transportation of oil or other commodity, except water and except natural or artificial gas, by pipeline." 49 U.S.C. Sec. 1(1)(b) (1959). The ICC regulated anhydrous ammonia pipeline rates pursuant to this authority. The DOE Act rather tersely provided for the transfer to the Secretary of Energy of "such functions set forth in the Interstate Commerce Act and vested by law in the Interstate Commerce Commission or the Chairman and members thereof as relate to transportation of oil by pipeline." 42 U.S.C. Sec. 7155 (emphasis added). The question then is whether by shifting to FERC jurisdiction over the "transportation of oil by pipeline," the DOE Act transferred authority over pipeline-transported anhydrous ammonia.
 
 
 9
 The language employed in section 7155 might seem to end this matter--whatever anhydrous ammonia is, it is not "oil," at least within that term's ordinary usage, and jurisdiction over its transport would thus seem to remain with the ICC. It does appear, however, that Congress intended a broader meaning of "oil". The purpose of the DOE Act, for example, was to consolidate within a single agency the previously "fragmented" implementation of the nation's energy policy and regulation of the nation's energy supply. See, e.g., 42 U.S.C. Secs. 7111, 7112; see generally S. REP. NO. 164, 95th Cong., 1st Sess. (1977), at 1-6 ("S.REP."), U.S.Code Cong. & Admin.News 1977, p. 854. As all parties, including the agencies, agree, Congress did not intend to transfer to FERC jurisdiction over pipeline-transported oil and leave the ICC with jurisdiction over pipeline-transported gasoline, kerosene, and diesel fuel. See Gulf Central, 50 FERC p 61,381, at 62,163-64; Gulf Central, 7 I.C.C.2d at 56-57. The legislative history, moreover, confirms that "oil" was not to be given a dictionary meaning, see S. CONF.REP. NO. 367, 95th Cong., 1st Sess. (1977), at 69; H.R. CONF.REP. NO. 539, 95th Cong., 1st Sess. (1977), at 69; S.REP. at 39.
 
 
 10
 The case consequently turns on whether Congress meant the term "oil" to embrace the agricultural fertilizer anhydrous ammonia (a non-energy-producing commodity). FERC asserts that its interpretation of "oil" as excluding anhydrous ammonia is entitled to deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But whether we give Chevron deference to an agency's determination of its own jurisdiction is undecided in this circuit. See, e.g., Otis Elevator Co. v. Sec'y of Labor, 921 F.2d 1285, 1290 (D.C.Cir.1990). And, we have declined to afford Chevron deference to an agency's interpretation of a statute which more than one agency is charged with interpreting. See Reporters Committee For Freedom of the Press v. United States Dep't of Justice, 816 F.2d 730, 734 (D.C.Cir.1987), rev'd on other grounds, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).[1] Because of these considerations, we will analyze the case as if deference were inappropriate. We think that the two agencies have the better reading of the statute--which, of course, makes unnecessary the resolution of the deference issue.[2]
 
 
 11
 Not only does section 7155 in particular provide no indication whatever that Congress meant to transfer to FERC regulatory jurisdiction over pipeline-transported anhydrous ammonia, but the DOE Act as a whole belies CF's position. The Act was "designed to 'assur[e] coordinated and effective administration of Federal energy policy and programs.' " United States v. Fulton, 475 U.S. 657, 662, 106 S.Ct. 1422, 1425, 89 L.Ed.2d 661 (1986) (quoting 42 U.S.C. Sec. 7112) (emphasis added). It accordingly established a separate agency "to bring together ... all of the major energy programs in the Federal Government." S.REP. at 1, U.S.Code Cong. & Admin.News 1977, p. 855 (emphasis added). The agency was to be responsible for overseeing federal efforts in, for example, "energy research and development," 42 U.S.C. Sec. 7112(5), development of energy supplies, see, e.g., S.REP. at 1, 6, regulation and reduction of demand for energy, see, e.g., 42 U.S.C. Sec. 7112(4), and regulation of energy prices, see, e.g., 42 U.S.C. Sec. 7112(9); S. REP. at 4.
 
 
 12
 The transport of anhydrous ammonia by pipeline implicates none of these functions nor any other energy-related concerns. Anhydrous ammonia "is not a fuel source, but [is] primarily an agricultural product." Gulf Central, 50 FERC p 61,381, at 62,166. Moreover, as FERC reasoned, pipelines used to transport anhydrous ammonia cannot be used to transport oil (and vice versa): "[a]nhydrous ammonia pipelines ... operate within substantially different pressure and heat ranges and use electric compressors because, unlike oil and gas pipelines, the commodity itself cannot be used for compressor fuel." Id. at 62,164. As a result, there is no competition between the two types of pipelines; the "transportation cost of [anhydrous ammonia thus] has little implication for the price of energy resources" and "regulation of transportation [of anhydrous ammonia] has no practical implication for energy matters." Id. at 62,166, 62,167. Indeed, whether there is any connection between anhydrous ammonia and FERC's assigned energy domain is far from clear.[3]
 
 
 13
 CF's case rests on a single, identically-worded, passage in both the House and the Senate Conference Reports stating that "[i]t is the intent of the conferees that the term 'transportation of oil by pipeline' shall include pipeline transportation of crude and refined petroleum and petroleum by-products, derivatives or petrochemicals." S.CONF.REP. NO. 367, 95th Cong., 1st Sess. (1977), at 69; H.R. CONF.REP. NO. 539, 95th Cong., 1st Sess. (1977), at 69, U.S.Code Cong. & Admin.News 1977, p. 940. CF maintains that anhydrous ammonia is a "petrochemical" because it is derived either from petroleum gas or from natural gas.
 
 
 14
 We think this sole reference in the legislative history inadequate to establish a statutory obligation that FERC regulate pipeline transportation of anhydrous ammonia when no hint of such a requirement appears in the statutory text. Although FERC conceded that anhydrous ammonia is considered a petrochemical as a matter of common usage within the petrochemical industry, it pointed to other sources limiting the definition of petro-chemicals to organic chemicals, which anhydrous ammonia is not. See 50 FERC p 61,381, at 62,164-65. In addition, as FERC explained, many other non-energy-related products are derived from oil and gas production (e.g., hydrogen, helium, nitrogen, and hydrogen sulfide); if the conference reports were both given the status of a congressional enactment and applied literally, FERC would also have to regulate the rates charged for each of these products if transported by pipeline. See id. at 62,164-65 n. 19. The reference in the conference reports hence is insufficient to offset the lack of any comparable indication in either the statutory language or other legislative history revealing the purpose of the Act. See, e.g., Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984).
 
 
 15
 CF alternatively maintains that FERC (and the ICC) are precluded from changing their positions on the issue of regulatory jurisdiction because of their earlier representations to the Seventh Circuit and because FERC for 12 years consistently regulated rates charged for transport of anhydrous ammonia by pipeline. Agencies, however, are permitted to reexamine their interpretation of their authorizing statute, see Chevron, 467 U.S. at 863, 104 S.Ct. at 2792, at least so long as they provide a reasoned explanation for any change, cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co., 463 U.S. 29, 42-43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983). FERC explained its shift in great detail, and CF's contention to the contrary is simply a rehash of its argument that the legislative history unambiguously provides for the transfer of regulatory authority from the ICC to FERC. In addition, we note that CF likewise took a position before the Seventh Circuit inconsistent with its position here; therefore, all parties in the case, and not just the agencies, have "changed positions as nimbly as if dancing a quadrille." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 540, 98 S.Ct. 1197, 1210, 55 L.Ed.2d 460 (1978) (quotation omitted).
 
 
 16
 * * * * * *
 
 
 17
 Accordingly, FERC's decision that it lacks jurisdiction to regulate the transportation of anhydrous ammonia by pipeline is
 
 
 18
 Affirmed.
 
 
 
 [1]
 Nevertheless, this might well be a compelling case to afford deference if it were necessary for decision since both agencies agree as to which of them has exclusive jurisdiction. Cf. National Treasury Employees Union v. United States Merit Systems Protection Bd., 743 F.2d 895, 916-17 (D.C.Cir.1984). If they did not agree, it would clearly be impossible to defer
 
 
 [2]
 That does not necessarily mean that the agencies could not change their position in the future. At that point, should the case come to us, we would have to decide whether Chevron deference should be afforded
 
 
 [3]
 CF argues that anhydrous ammonia transportation and federal energy policy are interconnected because petroleum gas and natural gas are used to produce ammonia, and that therefore a change in the price for ammonia transportation will affect the amount of ammonia produced and derivatively the amount of gas used to produce it. The short answer to this claim is that gas and oil are involved in the production processes of a host of commodities, see Process Gas Consumers Group v. United States Dep't of Agriculture, 694 F.2d 728, 748-49 n. 30 (D.C.Cir.1981), cert. denied sub nom. Louisiana v. FERC, 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 807 (1983), and if the transportation or production of these commodities for this reason alone made them part and parcel of federal energy policy, that policy (and FERC's jurisdiction) would encompass much of our economy