# UNITED STATES *v.* CITY OF FULTON ET AL.

No. 84–1725.   Argued January 21, 1986—Decided April 7, 1986

MARSHALL, J., delivered the opinion for a unanimous Court.

*Andrew J. Pincus* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, David M. Cohen,* and *John W. Showalter.*

*Charles F. Wheatley, Jr.,* argued the cause and filed a brief for respondents.*

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether the Secretary of Energy violated § 5 of the Flood Control Act of 1944, 16 U. S. C. § 825s, or his contractual obligations by putting rates for hydroelectric power generated at federally owned dams into effect on an interim basis pending further review by the Federal Energy Regulatory Commission. The Court of Claims held that the Secretary's actions exceeded his contractual and statutory authority, and granted summary

---

*\*Ralph J. Gillis* and *Robert D. Willis* filed a brief for Sam Rayburn Dam Electric Cooperative, Inc., as *amicus curiae* urging affirmance.

judgment to respondents. 230 Ct. Cl. 635, 680 F. 2d 115 (1982). After further proceedings, the Court of Appeals for the Federal Circuit affirmed, finding that the Court of Claims' decision was the law of the case and correct on the merits. 751 F. 2d 1255 (1985). We granted certiorari, 473 U. S. 903 (1985), and we now reverse.

## I

## A

In the Flood Control Act, Congress authorized the construction of a number of dam and reservoir projects, operated by the Army Corps of Engineers and producing large blocks of hydroelectric power. Congress had granted authority for several such projects before 1944, but had enacted no "general law governing the sale and distribution of power" so generated. S. Rep. No. 1030, 78th Cong., 2d Sess., 3 (1944). Intending "to place by law the responsibility for disposal of such power in an existing Federal agency," *ibid.*, Congress provided:

> "Electric power and energy generated at reservoir projects under the control of the War Department and in the opinion of the Secretary of War not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, *the rate schedules to become effective upon confirmation and approval by the Federal Power Commission.* Rate schedules shall be drawn having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years. . . ." Ch. 665, § 5, 58 Stat. 887, 890

(emphasis added) (codified as amended at 16 U. S. C. § 825s).

In order to sell the hydroelectric power turned over to him under that statute, the Secretary of the Interior created what eventually became five regional Power Marketing Administrations (PMAs). The PMA Administrators were assigned the responsibility of preparing rate schedules and the supporting accounting and cost allocation studies. There were no formal procedures for public participation in PMA preparation of rate schedules, although some of the PMAs (not including the Southwestern Power Administration (SWPA), immediately concerned in this suit) began to adopt such procedures starting in late 1977. See 45 Fed. Reg. 86976 (1980).

When determining whether to approve a PMA's proposed rates, the Federal Power Commission utilized its "special expertise" and its "independent judgment" in measuring the proposal against the statutory standards. *Bonneville Power Administration,* 34 F. P. C. 1462, 1465 (1965).[1] Because the Flood Control Act imposed no particular procedures for Commission review of rate proposals, the Commission was largely free to design its own. See *Southeastern Power Administration,* 54 F. P. C. 1631, 1632, n. (1975). It developed a practice of affording notice and comment to customers and other affected parties when the Secretary submitted a rate schedule, and granting requests for oral argument or public hearing on a case-by-case basis.

The parties differ as to the degree to which Commission practice included the use of interim rates. The Solicitor General cites several instances in which the Commission did

---

[1] The cited proceeding arose under both the Flood Control Act and the Bonneville Project Act of 1937, 50 Stat. 731, codified as amended at 16 U. S. C. §§ 832–832*l*. The relevant provisions of the two statutes are essentially identical, however, and the Commission and Secretary have treated them interchangeably. See 34 F. P. C., at 1465–1470; *infra,* at 667.

implement such rates; respondents answer that those instances were both isolated and unrepresentative. Our own examination of the historical record reveals that beginning in the 1970's, the Commission announced its intention to examine PMA rate proposals "on the basis of evidentiary records which are developed during the course of [adjudicatory] public hearings," *Bonneville Power Administration*, 54 F. P. C. 808, 810 (1975). It provided for full administrative hearings with cross-examination of witnesses.[2] At the same time, the Commission adopted, in some cases, the practice of examining rates submitted to it by the Secretary and, if the rates appeared to lie within the statutory boundaries, approving them on an interim basis pending the formal hearing. It required that the PMA refund any overcharges with interest if the Commission found after a hearing that an approved interim rate had been too high. See *Southeastern Power Administration*, 54 F. P. C. 3 (1975); *Bonneville Power Administration*, 52 F. P. C. 1912 (1974); see also *Bonneville Power Administration*, 58 F. P. C. 2498 (1977) (Federal Columbia River Transmission System Act). The Department of the Interior initially took the view that full evidentiary hearings were inappropriate under the Flood Control Act, and that if such hearings were to be held the Commission had no power to approve rates on an interim basis. The Commission, however, explicitly rejected that position. *Southeastern Power Administration, supra*, at 1632–1633; see also *Bonneville Power Administration*, 59 F. P. C. 1194, 1195 (1977) (Federal Columbia River Transmission System Act). The Interior Department then acquiesced in the Commission's view. See *ibid*.

---

[2] See *Southeastern Power Administration*, 54 F. P. C. 3 (1975), citing 18 CFR § 1.20 (1975) (superseded in 1978); *Bonneville Power Administration*, 52 F. P. C. 1912, 1912–1913 (1974). But see *Southwestern Power Administration*, 56 F. P. C. 795 (1976) (confirming new rate schedule without adjudicatory hearing, where SWPA had held on-the-record proceedings before proposing new rate).

## B

This regulatory scheme was upset in 1977, with the passage of the Department of Energy Organization Act, 42 U. S. C. § 7101 *et seq.* (DOE Act). That statute, designed to "assur[e] coordinated and effective administration of Federal energy policy and programs," § 7112, eliminated the Secretary of the Interior's role in hydroelectric power rate regulation, and abolished the Federal Power Commission entirely. The Interior Secretary's rate-proposing function was transferred to the new Secretary of Energy, "acting by and through [the] Administrators" of the PMAs. § 7152(a)(2). The Federal Power Commission's rate approval function was transferred to the Secretary of Energy as well.[3]

The Secretary of Energy institutionalized an interim rate-approval process for hydroelectric rates. He delegated to the Assistant Secretary for Resource Applications "the authority to develop, acting by and through the [PMA] administrators, and to confirm, approve, and place in effect on an *interim* basis, power and transmission rates for the five power marketing administrations." 43 Fed. Reg. 60636 (1978) (emphasis added).[4] He simultaneously delegated to the new Federal Energy Regulatory Commission (FERC)

---

[3] 42 U. S. C. § 7151(b) (transferring to the Secretary of Energy all FPC functions not explicitly transferred in Subchapter IV of the Act to the new Federal Energy Regulatory Commission). The Court of Claims' suggestion that FERC, rather than the Secretary, inherited the FPC's rate approval function has been abandoned by respondents, see *infra*, at 665, and is unsupported by the statutory language. See *United States* v. *Tex-La Electric Cooperative, Inc.*, 693 F. 2d 392, 395 (CA5 1982).

[4] The Assistant Secretary of Resource Applications' interim rate approval and implementation responsibilities were later transferred to the Assistant Secretary for Conservation and Renewable Energy. See 47 Fed. Reg. 4562, and n. 1 (1982). We shall refer to both of those officers as the "Assistant Secretary" throughout this opinion.

After FERC's final approval of the rates at issue in this case, the Secretary further modified the delegation order in certain respects. 48 Fed. Reg. 55664 (1983). The propriety of the administrative plan as modified in 1983, however, is not now before us.

"the authority to confirm and approve on a final basis, or to disapprove, rates developed by the Assistant Secretary." *Ibid.* Under the new regulatory scheme, the PMAs give extensive public notice of proposed rates. 10 CFR § 903.13 (1985). They provide all interested persons the opportunity to consult with and obtain information from the PMAs, to examine backup data, and to comment on the proposed rates. § 903.14. In most cases, the PMAs hold one or more "public information forums" and "public comment forums" regarding the rate proposal. §§ 903.15, 903.16. Following this consultation and comment period, the PMA Administrator must develop rates which, in the Assistant Secretary's judgment, should be confirmed, approved, and placed into effect on an interim basis. The Assistant Secretary must prepare a statement explaining the principal factors on which his decision to confirm and approve the rates was based. § 903.21.

The Assistant Secretary, after his interim confirmation and approval, submits the proposed rates to FERC for final confirmation and approval. FERC views its role in this process as "in the nature of an appellate body," 45 Fed. Reg. 79545, 79547 (1980); its function is to determine from the record before it whether "due process requirements have been met and [whether] the Administrator's program of rate schedules and the decision of the [Assistant Secretary] are rational and consistent with the statutory standards." *Ibid.* In exercising that appellate function, FERC relies on the record before it, remanding for supplementation if necessary. If it disapproves the interim rates confirmed and approved by the Assistant Secretary, the Assistant Secretary has the responsibility to submit acceptable substitute rates. Overcharges attributable to excessive interim rates must be refunded with interest to affected customers. 10 CFR § 903.22 (1985).

## II

The dispute in this case involves the price charged for the sale of hydroelectric power by the Southwestern Power Ad-

ministration (SWPA) to respondent cities of Lamar, Fulton, and Thayer, Missouri. Respondents and the United States first signed power purchase contracts in 1952, 1956, and 1963 respectively; the Lamar and Fulton contracts were renewed in early 1977. The language of the 1977 contract is typical:

"It is understood and agreed that the rates and/or terms and conditions set forth in the said Rate Schedule 'F–1,' with the confirmation and approval of the Federal Power Commission, may be increased, decreased, modified, superseded, or supplemented, at any time, and from time to time, and that if so increased, decreased, modified, superseded, or supplemented, the new rates and/or terms and conditions shall thereupon become effective and applicable to the purchase and sale of Firm Power and Firm Energy under this Contract in accordance with and on the effective date specified in the order of the Federal Power Commission containing such confirmation and approval." 230 Ct. Cl., at 638, 680 F. 2d, at 117 (emphasis by Court of Claims deleted).

Provisions for rate increases under the contracts at issue in this case went unused for a long time. SWPA did not increase its basic rate between 1957 and 1977. 44 Fed. Reg. 13068, 13069 (1979). Unfortunately, SWPA's costs did not also remain constant. As a result, FERC found by 1979 that SWPA's annual revenues fell about $20 million short of covering costs and repaying investment. *Ibid.*

After considerable congressional and Commission prodding, see H. R. Rep. No. 95–1247, p. 59 (1978); S. Rep. No. 95–1067, p. 53 (1978); *Southwestern Power Administration*, 58 F. P. C. 2170 (1977); see also Energy and Water Development Appropriations for 1980: Hearings before the Subcommittee on Energy and Water Development of the House Committee on Appropriations, 96th Cong., 1st Sess., 2995–2998 (1979), SWPA in April 1978 finally issued notice of a proposed 42% rate increase. 43 Fed. Reg. 16545 (1978). After the close of the public participation period, SWPA

developed new studies scaling down its estimate of necessary revenues, and developed new proposed rate schedules increasing basic rates only 33%. On March 1, 1979, the Assistant Secretary confirmed and approved the rates and placed them into effect on an interim basis, effective April 1, 1979. 44 Fed. Reg., at 13073.

In June 1981, FERC disapproved the rates as insufficiently supported, finding them likely to be too *low*. 46 Fed. Reg. 30877 (1981). On reconsideration in January 1982, however, FERC concluded that the rates, while "on the low side," were nonetheless reasonable; it confirmed and approved the rates through September 30, 1982. 47 Fed. Reg. 4562, 4563 (1982).

Respondents paid the increased rates assessed by SWPA. They then filed suit, seeking to recover money paid pursuant to the interim rate increase between April 1979 and January 1982. The Court of Claims ruled for respondents on the question of liability, 230 Ct. Cl. 635, 680 F. 2d 115 (1982), the Claims Court entered a $954,816 judgment in their favor, App. to Pet. for Cert. 19a–21a, and the Court of Appeals for the Federal Circuit affirmed, 751 F. 2d 1255 (1985).

## III

Respondents contend that interim approval of rate increases by the Assistant Secretary violates the Flood Control Act and their power purchase contracts. They predicate their argument on the statutory direction that rate increases shall "become effective upon confirmation and approval by the Federal Power Commission," and on the similar contractual language quoted *supra*, at 659. That language, according to respondents, by its terms precludes interim rate increases.

It is important to note what questions are *not* before this Court. Respondents do not contest that the DOE Act transferred the FPC's rate-approval function to the Secretary of Energy. See Brief for Respondents 39. They agree that

the Secretary could properly confirm and approve the rates on a final basis, without any further procedures or FERC involvement, *id.*, at 43–45, and that he could "delegate and divide that function amongst subordinate officials and agencies," *id.*, at 44. Further, respondents concede that the contractual language must be read, to some extent, in the light of the DOE Act: they do not argue that the contractual language, providing for rate increases "with the confirmation and approval of the Federal Power Commission," precludes any rate increase now that that body no longer exists. Rather, respondents' sole claim is that the statute and the contracts preclude the Secretary from making hydroelectric power rates effective before rendering a *final* determination that those rates satisfy all statutory requirements. A rate increase, they argue, can become effective only after the entire administrative review process has been completed.

## A

We turn first to respondents' statutory contention. Section 5 of the Flood Control Act, on its face, says little about the appropriate method of rate implementation under that Act. The relevant federal agencies, however, at least since the mid-1970's, have interpreted the statute to allow interim rate increases. See *supra*, at 661–663. We must uphold that interpretation if the statute yields up no definitive contrary legislative command and if the agencies' approach is a reasonable one. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–845 (1984).

The statutory language, providing only that "the rate schedules [shall] become effective upon confirmation and approval by the [Secretary]," does not definitively speak to the question of interim rates. Respondents argue that the requirement that rate schedules become effective "upon" confirmation and approval precludes the Secretary from making rates effective before all confirmation and approval are completed. The Court of Claims agreed. We can find, how-

ever, no such unambiguous meaning in the wording of the statute. The agency's practice of allowing rates to become effective after *interim* "confirmation and approval," even though the rates are subject to further examination, is as consistent with the bare statutory language as is respondents' preferred arrangement.

Nor does the legislative history of the Flood Control Act resolve the ambiguity. Respondents draw on that legislative history in arguing that the drafters of § 5 of the Flood Control Act (like the drafters of § 6 of the Bonneville Project Act of 1937, on which § 5 of the Flood Control Act was based) intended to "protec[t] the power consumers." 90 Cong. Rec. 9283 (1944) (statement of Rep. Rankin). Respondents point out that during the pendency of an interim rate increase, power consumers pay more than they would have paid otherwise, and perhaps more than they should pay. Yet as we shall discuss more extensively below, the goal of protecting power customers is not the only policy embodied in the Flood Control Act. The existence of that policy, without more, hardly supplies an unambiguous legislative command barring any imposition of interim rates. Respondents rely on a statement by Secretary Ickes that the Federal Power Commission would have final yes-or-no authority over rates under the Bonneville Project Act, Columbia River (Bonneville Dam), Oregon and Washington: Hearings on H. R. 7642 before the House Committee on Rivers and Harbors, 75th Cong., 1st Sess., 150 (1937), but that statement is not particularly helpful in determining Congress' intent regarding interim rates.

In the absence of a clear legislative command, we must consider whether the Secretary's choice "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.'" *Chevron, supra*, at 845, quoting *United States* v. *Shimer*, 367 U. S. 374, 383 (1961). The Secretary has a dual obligation under the Flood Control Act. He is required to protect consumers

by ensuring that power is sold "at the lowest possible rates . . . consistent with sound business principles." See *United States* v. *Tex-La Electric Cooperative, Inc.*, 693 F. 2d 392, 399–400 (CA5 1982). He is also, however, required by the plain language of the statute to protect the public fisc by ensuring that federal hydroelectric programs recover their own costs and do not require subsidies from the federal treasury. See H. R. Conf. Rep. No. 2051, 78th Cong., 2d Sess., 7 (1944); see also S. Rep. No. 2280, 74th Cong., 2d Sess., 2 (1936) (Bonneville Project Act); H. R. Rep. No. 2955, 74th Cong., 2d Sess., 2 (1936) (same).

Interim ratesetting appears well suited to accommodating that dual goal. That process protects consumers by subjecting proposed rates to initial review before they are made effective, and by allowing for refunds if the rates are ultimately disapproved. It protects the Government by allowing it to collect rate increases that are necessary for recovery of its costs, without having to wait for time-consuming final review. It helps eliminate the possibility that delay in implementation of rate increases, particularly in a period of high inflation, will cause the Government constantly to be playing catchup in its attempt to secure an appropriate rate.

Respondents argue that the Secretary's plan is inconsistent with the congressional scheme because it allows the implementation of rates that may not meet the statutory standards, and that may ultimately be found to be too high. Congress, respondents argue, intended to eliminate just such a possibility when it interposed the requirement of FPC "confirmation and approval" in the ratesetting process. The refund process, they contend, offers insufficient protection because while excessive charges are immediately passed on to the ultimate consumers, refunds of those charges may not successfully trickle down to those same consumers. Yet ratesetting agencies charged with protecting the public commonly have the power to allow rates to go into effect

prior to the completion of administrative review. See, *e. g.*, Natural Gas Act, § 4(e), 15 U. S. C. § 717c(e); Federal Power Act, § 205(e), 16 U. S. C. § 824d(e); Federal Communications Act, § 204, 47 U. S. C. § 204; Interstate Commerce Act, § 15(7), 49 U. S. C. § 10708. See generally W. Jones, Cases and Materials on Regulated Industries 122–126 (2d ed. 1976). Congress plainly has not found that practice necessarily incompatible with the goal of consumer protection.

Respondents rely on *FPC* v. *Tennessee Gas Transmission Co.*, 371 U. S. 145 (1962), for the proposition that refunds are an inadequate remedy for excessive rates. In *Tennessee Gas*, the Commission was faced with a statutory scheme under which a private utility could put a rate increase into effect, after an initial suspension period, without any governmental review of the legality of the increase. The utility argued that once an increased rate went into effect, it should be allowed to collect that rate until the completion of all Commission proceedings on the legality of the rate, since any illegal charges ultimately would be subject to refund. We rejected that position, holding that the Commission did not have to rely solely on its refund procedure to protect consumers and could instead order an interim reduction of the increased rate.

*Tennessee Gas* does not support respondents' argument. Where the Government seeks to implement an increase under the Flood Control Act, there is no danger of unreviewed illegal rates, as in *Tennessee Gas*. The rate when implemented has already been the subject of extensive public participation and review by the Assistant Secretary. The Secretary does not rely solely on the refund procedure to protect consumers, and thus the concerns that led the *Tennessee Gas* Court to find that process inadequate are not present. Instead, *Tennessee Gas* illustrates the authority this Court repeatedly has given regulatory agencies to do precisely what respondents claim they should not be able to do—

to issue interim rate orders prior to final determinations whether proposed rates meet statutory requirements.

Respondents argue that the Secretary should be barred from setting interim rates absent explicit congressional authorization. The Secretary, they contend, cannot create a complex regulatory structure out of thin air. The provisions of the Flood Control Act, however, are general, and are in all respects less complex than the analogous provisions of the Federal Power Act governing regulation of private utility charges. Congress, in declining to set out a detailed mandatory procedural scheme, apparently intended to leave the agency substantial discretion as to how to structure its review. There is no support in the legislative history for the proposition that Congress intended to bar the Secretary from taking all steps regarding power rate regulation not explicitly set out in the general terms of §5 of the Flood Control Act, and Congress may reasonably have intended to allow more administrative discretion with regard to this federal proprietary activity than with regard to control of private rates. Limiting the agency as respondents suggest would thus disserve Congress' goal of establishing "a convenient and practical method of disposing of power at [federal hydroelectric] projects." S. Rep. No. 1030, 78th Cong., 2d Sess., 3 (1944).

Indeed, this Court has in other contexts allowed agencies to set interim rates even though their governing statutes did not explicitly so provide. In the *Trans Alaska Pipeline Rate Cases*, 436 U. S. 631 (1978), we held that it was "an intelligent and practical exercise of [the agency's rate] suspension power," *id.*, at 653, for the Interstate Commerce Commission to set out, without a hearing, interim rates that it would allow to go into effect. We further held that the Commission had authority to condition such an action on the carriers' promise to refund charges ultimately found to be too high. That refund scheme, although nowhere explicitly approved in the statute, was a "'legitimate, reasonable, and direct adjunct to the Commission's explicit statutory power

to suspend rates pending investigation.'" *Id.*, at 655, quoting *United States* v. *Chesapeake & Ohio R. Co.*, 426 U. S. 500, 514 (1976). The *Trans Alaska Pipeline Rate Cases* were decided under a quite different statutory scheme from the one at issue today, and analogies between the two statutory schemes are loose at best. We see no reason, however, why we should take a narrower approach to the Secretary's powers under the Flood Control Act than we took to the ICC's under its enabling statute.[5]

We therefore hold that the procedures established by the Secretary to exercise his powers under the Flood Control Act both are within his delegated authority and constitute a reasonable accommodation of the policies underlying that Act. At bottom, respondents seek to strike down the Secretary's scheme on the ground that it gives power customers *too much* process. They concede that there could be no objection to a scheme under which rate review was simply cut off after the Assistant Secretary's examination, but contend that the administrative plan must be invalidated because the Secretary has allowed still another layer of review. We would not be disposed to accept such a claim absent particularly compelling argument in its favor. Respondents have not supplied such argument here.

## B

Respondents also argue that interim rate increases violate the terms of their power purchase contracts. Respondents make no claim that the contracts must be read literally, to bar any rate increase absent approval by a nonexistent Federal Power Commission. They nonetheless argue that the

---

[5] Respondents finally point to § 501(a)(1) of the DOE Act, 42 U. S. C. § 7191(a)(1), which provides that that Act was not intended to abrogate "administrative procedure requirements" imposed by other statutes, including the Flood Control Act. Because we find in the Flood Control Act no "administrative procedure requirement" barring interim rates, this provision adds nothing to respondents' case.

contractual language unambiguously bars the imposition of interim rates. We can detect no such absolute bar.

Respondents have presented no evidence demonstrating that the parties intended the contractual language, which tracks that of the statute, to do anything other than incorporate the statute's procedural requirements. The Court of Claims based its acceptance of respondents' position on its desire to construe the contracts "in harmony with" its interpretation of the statutory language, which, it noted, "is incorporated into the contract terms"; on its conclusion that there was no significant administrative practice of interim rate increases; and on its conclusion that the plain meaning of the contractual language unambiguously bars such rate increases. 230 Ct. Cl., at 641–645, 680 F. 2d, at 119–121. The first premise is no longer helpful to respondents, since we have determined that the statute allows the imposition of interim rate increases. We have also rejected the second premise, see *supra*, at 661–663. We now reject the third. The contractual provision that rate increases will become effective "on the effective date specified in the order of the Federal Power Commission containing such confirmation and approval" is, by its terms, no more of a bar to rate increases becoming effective upon *interim* "confirmation and approval" than is the parallel statutory language. If the Government had meant by that contractual language to bind itself with restrictions going beyond those contained in the statute, we believe that such restrictions would have been set out more explicitly.

## IV

We conclude that nothing in the Flood Control Act or the power purchase contracts at issue in this case precludes the Secretary from making hydroelectric power rates effective upon interim confirmation and approval, even though further review is still pending. The judgment of the Court of Appeals for the Federal Circuit, accordingly, is reversed.

*It is so ordered.*