**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CENTRAL ELECTRIC POWER
COOPERATIVE, INCORPORATED; SALUDA
RIVER ELECTRIC COOPERATIVE,
INCORPORATED; SOUTH CAROLINA
PUBLIC SERVICE AUTHORITY,
            *Plaintiffs-Appellants,*

v.

SOUTHEASTERN POWER
ADMINISTRATION; CHARLES A.
BORCHARDT, in his capacity as
Administrator of the Southeastern
Power Administration; FEDERAL
ENERGY REGULATORY COMMISSION;
DEPARTMENT OF ENERGY; SPENCER
ABRAHAM, in his capacity as
Secretary of Energy,
            *Defendants-Appellees.*

THE MUNICIPAL ELECTRIC
AUTHORITY OF GEORGIA,
      *Amicus Supporting Appellees.*

No. 02-2027

CENTRAL ELECTRIC POWER
COOPERATIVE, INCORPORATED; SALUDA
RIVER ELECTRIC COOPERATIVE,
INCORPORATED; SOUTH CAROLINA
PUBLIC SERVICE AUTHORITY,
                    *Plaintiffs-Appellees,*

                    v.

SOUTHEASTERN POWER
ADMINISTRATION; CHARLES A.
BORCHARDT, in his capacity as
Administrator of the Southeastern
Power Administration; FEDERAL
ENERGY REGULATORY COMMISSION;
DEPARTMENT OF ENERGY; SPENCER
ABRAHAM, in his capacity as
Secretary of Energy,
                    *Defendants-Appellants.*

THE MUNICIPAL ELECTRIC
AUTHORITY OF GEORGIA,
          *Amicus Supporting Appellants.*

No. 02-2035

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(CA-91-2449-3-10)

Argued: June 5, 2003

Decided: July 29, 2003

Before WILKINSON and LUTTIG, Circuit Judges, and
Henry E. HUDSON, United States District Judge for the Eastern
District of Virginia, sitting by designation.

Reversed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Luttig and Judge Hudson joined.

---

**COUNSEL**

**ARGUED:** A. Hewitt Rose, III, BRICKFIELD, BURCHETTE, RITTS & STONE, P.C., Washington, D.C., for Appellants. Gillian Flory, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Kathleen T. Spear, BRICKFIELD, BURCHETTE, RITTS & STONE, P.C., Washington, D.C.; Elizabeth H. Warner, SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, Moncks Corner, South Carolina, for Appellants. Robert D. McCallum, Assistant Attorney General, Robert Greenspan, Felix Baxter, C. Max Vassanelli, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Donald W. Tyler, TYLER, CASSELL, JACKSON, PEACE & SILVER, L.L.P., Columbia, South Carolina, for Amicus Curiae.

---

**OPINION**

WILKINSON, Circuit Judge:

Plaintiffs brought this action in federal district court to set aside defendants' rate schedule for the sale of hydroelectric power under the Flood Control Act. Plaintiffs argued, and the district court held, that the rate schedule was arbitrary and capricious because it imposed a surcharge on plaintiffs in order to recover revenue shortages incurred during a prior rate period. However, the Flood Control Act authorizes defendants to recover such costs and affords them considerable discretion in structuring rate schedules in order to do so. We therefore reverse the judgment of the district court.

I.

In the Flood Control Act of 1944, Congress authorized the construction and operation of certain dam and reservoir projects. *United*

*States v. City of Fulton*, 475 U.S. 657, 659 (1986). Congress then assigned responsibility for selling the power produced by these projects to the Department of Energy (DOE), instructing the DOE to sell such power at below-market costs. The DOE sells and markets power through regional Power Marketing Administrations (PMAs) such as defendant Southeastern Power Administration (SEPA). *Id.* at 660; 16 U.S.C. § 825s (2000); 42 U.S.C. § 7152 (2000). The PMAs are responsible for setting rate schedules based on the recovery of costs associated with generating hydroelectric power, the amortization of the federal capital investment and any past expenses not recovered under prior rate schedules. Finally, the Act requires PMAs to give preference in the sale of this low-cost power to public bodies and cooperatives such as the plaintiffs. 16 U.S.C. § 825s.

As "preference customers" under the Act, plaintiffs Central Electric Power Cooperative, Inc. ("Central Electric"), Saluda River Electric Cooperative, Inc. ("Saluda River"), and South Carolina Public Service Authority ("Santee Cooper") contract with SEPA to purchase hydroelectric power at below-market rates. Prior to the current dispute, plaintiffs had entered into contracts to purchase power effective September 30, 1985, through September 30, 1990. During the term of the contracts, however, much of the southeastern United States experienced a severe drought. The drought limited hydroelectric production in the area, forcing SEPA to make separate power purchases in order to honor its power supply contracts. These extra power purchases in turn caused SEPA to incur costs exceeding those contemplated by the 1985 rate schedule. Under the current rate, SEPA would not be able to cover its costs as required by the Flood Control Act. 53 Fed. Reg. 47,864-05 (Nov. 28, 1988). SEPA thus needed to devise a rate schedule that would address the shortfall.

In November 1988, SEPA explained the predicament to its preference customers and asked them to voluntarily amend their power contracts to reflect a rate increase effective June 1, 1989. SEPA then held two public forums and accepted written comments from interested parties. Several preference customers submitted written comments favoring the early rate increase. Central Electric filed written comments opposing the rate increase and declining to modify its contract.

On March 10, 1989, SEPA convened another meeting during which the parties discussed the alternatives available to SEPA: (1)

charge the agreeing preference customers rates sufficient to cover the total revenue shortfall, including the non-agreeing customers' share; (2) charge the agreeing customers their portion of the shortfall through the proposed short-term rate and charge the non-agreeing customers their portion of the shortfall in the next rate filing; and (3) withdraw the proposed short-term rate and charge each preference customer its share of the revenue shortfall in the next rate filing. The preference customers present at the meeting strongly favored the second option, which gave each customer the option to choose when to pay its portion of the shortfall. SEPA subsequently adopted a rate schedule under which agreeing preference customers voluntarily amended their contracts, and FERC approved. *Southeastern Power Admin.*, 49 F.E.R.C. ¶ 62,109 (1989). SEPA made clear, however, that non-agreeing customers who continued to purchase power from SEPA after the expiration of the 1985 contracts would pay their portion of the shortfall in the next rate filing. Ultimately, 168 of SEPA's 174 preference customers voluntarily amended their contracts.

On March 9, 1990, in anticipation of the September 30, 1990, contract expirations, SEPA published a proposed rate schedule for the October 1, 1990 contract term. 5 Fed. Reg. 8981 (Mar. 9, 1990). In addition to charging a new base rate, the schedule imposed an energy surcharge on the six preference customers who had not yet paid their share of the prior term's revenue shortfall. Plaintiffs filed a joint protest and comment with SEPA and orally opposed the surcharge at a public information and comment forum. Other preference customers filed written comments supporting the proposed rates.

After the DOE Deputy Secretary approved the proposed rates on an interim basis, plaintiffs filed before FERC a protest of the rate filing. They also made a motion to intervene in the FERC proceedings, which FERC granted. Plaintiffs argued that the surcharge was discriminatory and constituted illegal retroactive ratemaking. FERC, however, concluded that whether or not the surcharge constituted retroactive ratemaking was not relevant because the Flood Control Act does not prohibit retroactive ratemaking. *Southeastern Power Admin.*, 55 F.E.R.C. ¶¶ 61,016, 61,045 (1991). FERC also dismissed plaintiffs' argument that the surcharge was discriminatory because "the decision to correct for past cost underrecoveries through a sur-

charge is not arbitrary or capricious, or in violation of the law." *Id.* FERC thus issued a final order approving the rate schedule. *Id.*

On August 15, 1991, plaintiffs brought this action in South Carolina district court, alleging that the 1990 rate surcharge violated the Flood Control Act. Plaintiffs requested that the district court declare the surcharge unlawful and enjoin SEPA from implementing it, and order SEPA to refund to plaintiffs any amounts charged them pursuant to the surcharge. Plaintiffs then moved for summary judgment, which the court granted in their favor. The district court concluded that plaintiffs' failure to amend their 1985 contracts was not a permissible basis upon which to impose the surcharge, and thus that defendants lacked a rational basis for the surcharge. This appeal followed.

II.

A.

Inasmuch as the complaint charges unlawful agency action, our review is governed by the Administrative Procedures Act. 5 U.S.C. §§ 701, 702 (2000). Given the expertise of agencies in the fields they regulate, a presumption of regularity attaches to administrative actions. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977)). Thus "[t]he ultimate standard of review is a narrow one." *Id.* at 416. Under 5 U.S.C. § 706, we ask only whether the challenged agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." If an agency's decision was based on a consideration of the relevant factors and there has been no clear error of judgment, we must uphold it. *Citizens to Preserve Overton Park*, 401 U.S. at 416.

B.

Under the Flood Control Act, PMAs such as SEPA are required to set rates for the sale of hydroelectric power in accordance with two criteria. *See* 16 U.S.C. § 825s. First, PMAs must devise rate schedules that encourage "the most widespread use [of hydroelectric power] at the lowest possible rates to consumers consistent with sound business

principles . . . ." *Id.* Second, PMAs must devise rate schedules with "regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years." *Id.* The DOE has interpreted this language to require the recovery of operation and maintenance costs, purchased and exchanged power costs, interest expenses on the power investment, costs associated with the amortization of the capital investment, and any deficit of unrecovered expenses which prior years' revenues failed to cover. DOE Order 6120.2 (Sept. 20, 1979).

In fact, PMAs are "required by the plain language of [the Flood Control Act] to protect the public fisc by ensuring that federal hydroelectric programs recover their own costs and do not require subsidies from the federal treasury." *Fulton*, 475 U.S. at 668. Thus when a drought in the southeastern United States limited hydroelectric production in the area and caused SEPA's costs to rise beyond what SEPA would recover under the 1985 rate schedule, SEPA was required by statute to address the revenue shortfall. However since "[i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission," *Town of Norwood v. FERC*, 962 F.2d 20, 22 (D.C. Cir. 1992), SEPA enjoys considerable discretion in determining how to structure the recovery of such costs.

For example, PMAs must sometimes set rates specifically aimed at recovering revenue shortages sustained during prior rate periods. Although provisions in the Natural Gas Act, 15 U.S.C. §§ 717c and 717d (2000), and the Federal Power Act, 16 U.S.C. §§ 824d and 824e (2000), prohibit retroactive ratemaking, the Flood Control Act contains no similar provisions. Indeed, PMAs would be unable to meet the requirements of the Flood Control Act if they were prohibited from devising rates aimed at addressing unexpected revenue shortfalls. FERC has thus previously approved rates specifically designed to recover revenue shortfalls incurred under prior rate schedules. *See Southwestern Power Admin.*, 18 F.E.R.C. ¶¶ 61,052, 61,088 (1982); *Southwestern Power Admin.*, 23 F.E.R.C. ¶¶ 61,403, 61,895 (1983). And the Supreme Court has also approved this approach. *See Fulton*, 475 U.S. at 668 (approving interim rate-setting to eliminate the possi-

bility of "the Government constantly . . . playing catchup in its attempt to secure an appropriate rate").

Congress did not set out a "detailed mandatory procedural scheme" to govern FERC's review of rates, "apparently intend[ing] to leave the agency substantial discretion as to how to structure its review." *Fulton*, 475 U.S. at 670. In the context of the Flood Control Act, FERC regards its role in reviewing rates as "in the nature of an appellate body," limiting its review to whether "due process requirements have been met and [whether] the Administrator's program of rate schedules and the decision of the [PMA] are rational and consistent with the statutory standards." *Fulton*, 475 U.S. at 663 (quoting 45 Fed. Reg. 79544, 79547 (Dec. 1, 1980)). The nature of review here is thus doubly limited, first by FERC's own circumscribed review of SEPA's rate schedule, and then again by the deference we owe FERC's ruling that the rate design here was permissible.

## C.

Notwithstanding the discretion afforded under the Flood Control Act to SEPA in setting rates, plaintiffs contend that the 1990 rate surcharge was arbitrary and capricious as well as a breach of contract.[1] Specifically, plaintiffs argue that the surcharge is illegal because it is discriminatory and retroactively breaches plaintiffs' 1985 fixed-rate contracts.[2] Plaintiffs apparently argue that SEPA should have spread the increased costs to all customers under the 1990 rate, regardless of the fact that 168 of the 174 preference customers had already paid their share of the revenue shortfall. However the advancement of a patently inequitable alternative rate design comes nowhere near proving that the SEPA surcharge is arbitrary and capricious. Defendants in fact acted well within their discretion in setting and approving the 1990 rate schedule.

---

[1]Plaintiffs do not challenge SEPA's compliance with the APA's procedural requirements, 5 U.S.C. § 553, or the calculations determining the projected costs defendants sought to recover under the 1990 rate.

[2]Plaintiffs also argue that the surcharge constitutes illegal retroactive ratemaking. We need not decide whether the surcharge constitutes "retroactive" ratemaking, however, because such ratemaking is not prohibited by the Flood Control Act. *See Southeastern Power Admin.*, 55 F.E.R.C. ¶ 61,045.

SEPA adopted a rate design that would afford its preference customers three options: pay their portion of the shortfall immediately by amending their 1985 contracts to reflect a higher rate, pay their portion of the shortfall under the October 1990 contracts, or decline to renew their purchase contracts in October 1990 and pay no portion of the shortfall at all. The rate was thus designed to produce the most flexible result possible: all preference customers who maintained hydroelectric power contracts under the 1985 rate either paid for their portion of the revenue shortfall, albeit at different times, or avoided paying their share but also forfeited the ability to purchase power from SEPA at below-market rates. Indeed, to allow plaintiffs to avoid paying their share of the shortfall but still purchase low-cost power from SEPA would discriminate against the other preference customers who would be forced to subsidize plaintiffs' rates. Thus in this context, applying a surcharge only to the six non-agreeing preference customers does not make the rate arbitrary and capricious. *See Associated Elec. Coop., Inc. v. Morton*, 507 F.2d 1167, 1177 (D.C. Cir. 1974) (rate revision imposing new transmission charge affecting only one of the PMA's customers "does not necessarily make the transmission charge discriminatory").

Next plaintiffs argue that the surcharge is arbitrary and capricious because it retroactively breaches their 1985 purchase contracts. But the notion of a "retroactive breach of contract" makes no sense. This contract, by its very nature, was governed by a specific term. The 1985 rate schedule expired on September 30, 1990. The surcharge applied only to purchases made after October 1, 1990. Since the surcharge is only applied prospectively, its imposition cannot constitute a retroactive breach of the 1985 rate schedule because the parties are no longer bound by that schedule. Plaintiffs could have avoided paying the surcharge by declining to renew the contract on October 1, 1990.

## D.

It was well within SEPA's discretion to structure the rates in the way that it did. The judgment of the district court is therefore

*REVERSED*.