**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES; BENTON
RURAL ELECTRIC ASSOCIATION;
COLUMBIA-SNAKE RIVER IRRIGATORS
ASSOCIATION; UMATILLA ELECTRIC;
EASTERN OREGON IRRIGATORS
ASSOCIATION,
                    *Petitioners,*

PUGET SOUND ENERGY; AVISTA
CORPORATION; PACIFIC NORTHWEST
GENERATING COMPANY (PNGC);
PUBLIC UTILITY DISTRICT NO. 1 OF
SNOHOMISH COUNTY, WASHINGTON,
                    *Petitioner-Intervenor,*

                    v.

BONNEVILLE POWER
ADMINISTRATION,
                    *Respondent,*

PACIFICORP; PORTLAND GENERAL
ELECTRIC COMPANY,
                    *Respondent-Intervenor.*

No. 03-71626

Power Act

PUBLIC UTILITY DISTRICT NO. 1 OF
BENTON COUNTY; PUBLIC UTILITY
DISTRICT NO. 1 OF COWLITZ
COUNTY; PUBLIC UTILITY DISTRICT
NO. 1 OF FRANKLIN COUNTY; PUBLIC
UTILITY DISTRICT NO. 2 OF GRANT
COUNTY; PUBLIC UTILITY DISTRICT
NO. 1 OF GRAYS HARBOR COUNTY;
PUBLIC UTILITY DISTRICT NO. 1 OF
PENDOREILLE COUNTY; THE CITY OF
SEATTLE; SEATTLE CITY LIGHT
DEPARTMENT (GENERATING PUBLIC
UTILITIES); PUBLIC POWER COUNCIL,
                    *Petitioners,*

PACIFIC NORTHWEST GENERATING
COMPANY (PNGC); PUGET SOUND
ENERGY; AVISTA CORPORATION;
PUBLIC UTILITY DISTRICT NO. 1 OF
SNOHOMISH COUNTY, WASHINGTON,
            *Petitioner-Intervenor,*

                v.

BONNEVILLE POWER
ADMINISTRATION,
                    *Respondent,*

PACIFICORP; PORTLAND GENERAL
ELECTRIC COMPANY,
            *Respondent-Intervenor.*

No. 03-71894

Power Act

ALCOA, INC.,
                                    *Petitioner,*

PACIFIC NORTHWEST GENERATING
COMPANY (PNGC); PUGET SOUND
ENERGY; AVISTA CORPORATION;
PUBLIC UTILITY DISTRICT NO. 1 OF
SNOHOMISH COUNTY, WASHINGTON,                    No. 03-71931
                *Petitioner-Intervenor,*          Power Act

                    v.                              OPINION

BONNEVILLE POWER
ADMINISTRATION,
                                   *Respondent,*

PACIFICORP; PORTLAND GENERAL
ELECTRIC COMPANY,
                *Respondent-Intervenor.*

On Petition for Review of an Order of the
Bonneville Power Administration

Argued and Submitted
October 7, 2004—Seattle, Washington

Filed May 24, 2005

Before: Dorothy W. Nelson, Sidney R. Thomas,
Circuit Judges, and David A. Ezra,* District Judge.

Opinion by Judge Thomas

---

*The Honorable David A. Ezra, Chief Judge, United States District
Court for the District of Hawaii, sitting by designation.

## COUNSEL

Michael B. Early, Portland, Oregon, for petitioner Alcoa Inc.

Melinda J. Davison, Irion A. Sanger, Davison Van Cleve, Portland, Oregon, for petitioners Industrial Customers of Northwest Utilities, Benton Rural Electric Association, Columbia-Snake River Irrigators Association, Umatilla Electric, Eastern Oregon Irrigators Association.

Denise Peterson, Portland, Oregon, for petitioner Public Power Council.

Raymond S. Kindley, Schwabe, Williamson & Wyatt, Portland, Oregon, for petitioners Public Utility District No. 1 of Benton County, Public Utility District No. 1 of Cowlitz County, Public Utility District No. 1 of Franklin County, Public Utility District No. 2 of Grant County, Public Utility District No. 1 of Grays Harbor County, Public Utility District No. 1 of Pendoreille County, the City of Seattle, Seattle City Light Department.

Michael J. Gianunzio, Eric Lee Christensen, Everett, Washington, for petitioner Public Utility District No. 1 of Snohomish County, Washington.

Gary A. Dahlke, R. Blair Strong, Paine, Hamblen, Coffin, Brooke, & Miller, LLP, Spokane, Washington, for petitioner-intervenor Avista Corporation.

R. Erick Johnson, Portland, Oregon, for petitioner-intervenor Pacific Northwest Generating Company.

Kirstin S. Dodge, Perkins Coie, LLP, Bellevue, Washington, for petitioner-intervenor Puget Sound Energy.

Eric Lee Christensen, Michael J. Gianunzio, Everett, Washington, for petitioner-intervenor Public Utility District No. 1 of Snohomish County, Washington.

Randy A. Roach, Marybeth Van Buren, Karin J. Immergut, United States Attorney, District of Oregon, Stephen J. Odell,

Assistant U.S. Attorney, Kurt R. Casad, Special Assistant U.S. Attorney, Portland, Oregon, for respondent Bonneville Power Administration.

Marcus Wood, Stephen C. Hall, Stoel Rives LLP, Portland, Oregon, for respondent-intervenor Pacificorp.

Loretta Mabinton, Portland, Oregon, for respondent-intervenor Portland General Electric Company.

## OPINION

THOMAS, Circuit Judge:

This consolidated appeal presents the question, *inter alia*, of whether the Bonneville Power Administration ("BPA") determination to commence a rate hearing to decide whether the BPA should impose Safety-Net Cost Recovery Adjustment Charges is a final agency decision subject to judicial review. We conclude that it is not and dismiss the petitions for review for lack of jurisdiction.

I

The BPA is a federal agency within the United States Department of Energy created by Congress in 1937 to market hydroelectric power generated by the Federal Columbia River Power System, a series of dams along the Columbia River in Oregon and Washington. 16 U.S.C. §§ 832-832m. Congress has since expanded the BPA's mandate to include marketing authority over nearly all the electric power generated by federal facilities in the Pacific Northwest. *Id.* § 838f. The BPA is charged with oversight of the federal high-voltage transmission system used to deliver power generated at a federally owned and operated facility, as well as non-federal power to its customers. *Id.* § 838b. It owns and operates approximately

eighty percent of the Pacific Northwest's high-voltage transmission system and markets approximately forty percent of the electric power consumed in the Pacific Northwest. *Ass'n of Pub. Agency Customers, Inc. v. BPA*, 126 F.3d 1158, 1163 (9th Cir. 1997).

The BPA's general authority is derived from four organic statutes: the Bonneville Project Act of 1937 ("the Project Act"), 16 U.S.C. §§ 832-832m; the Regional Preference Act, *id.* §§ 837-837h; the Columbia River Transmission Act ("the Transmission Act"), *id.* §§ 838-838l; and the Pacific Northwest Electric Power Planning and Conservation Act of 1980 ("the Northwest Power Act"), *id.* §§ 839-839h. *Ass'n of Pub. Agency Customers*, 126 F.3d at 1164. The BPA's rate-making authority is derived from the Project Act, the Transmission Act, the Northwest Power Act, and the Flood Control Act of 1944, 16 U.S.C. § 825s. Pursuant to the Northwest Power Act, the BPA's power rates are established by the BPA, but subject to approval by the Federal Energy Regulatory Commission ("FERC"). *Id.* § 829e. After 1974, when Congress transformed the BPA into a self-financing agency, *see id.* § 838i, the power rates charged by the BPA became its source of revenue. *Cent. Lincoln Peoples' Util. Dist. v. Johnson*, 735 F.2d 1101, 1116 (9th Cir. 1984).

The Northwest Power Act requires the BPA to establish rates that will "produce sufficient revenues to ensure BPA's fiscal independence and repay the U.S. Treasury for the federal funds that were borrowed to build the projects in the Federal Columbia River Power System." *Cal. Energy Comm'n v. BPA*, 909 F.2d 1298, 1303 (9th Cir. 1990); 16 U.S.C. §§ 838g, 839e(a)(1). At the same time, Congress requires that the BPA market federal power "with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles." 16 U.S.C. §§ 838g, 839e(a)(1).

The BPA Administrator is required periodically to revise rates to recover the capital costs and expenses associated with

the Columbia River Power System. *See id.* §§ 832f, 838g, 839e(a)(1). The procedures governing the establishment of rates are set by statute and include the following: issuance of a Federal Register notice announcing the proposed rates; one or more hearings; the opportunity to submit written views, supporting information, questions, or arguments; and a decision by the Administrator based on the record developed during the hearing process. *Id.* § 839e. Rates established by the BPA only become effective after approval by FERC. *Id.* § 839e(a)(2).

The rate schedules proposed by the BPA are termed "General Rate Schedule Provisions" ("GRSP"). The origins of the present controversy arose out of a supplemental rate proposal promulgated by the BPA in 2001. The BPA had previously proposed new wholesale power rates to be effective on October 1, 2001, 64 Fed. Reg. 44,318 (1999), and different rates to be effective Fiscal Year 2002, 65 Fed. Reg. 44,041 (2000).

After these filings, increased load obligations and higher market prices caused the BPA to determine that its rate proposals would be insufficient to assure it could cover costs and repay U.S. Treasury obligations. On December 1, 2000, the BPA published its proposed amendments to the 2002 wholesale power rate adjustment proposal. 65 Fed. Reg. 75,272 (2000). Further market changes caused the BPA to issue supplemental wholesale power rate filing on June 29, 2001. 66 Fed. Reg. 37,664 (2001). The supplemental proposal adjusted the previous GRSP by replacing the capped single Cost Recovery Adjustment Clause ("CRAC") with a three-component CRAC: the Load-Based CRAC (or "LB CRAC", as it is referenced in the BPA filings) designed to cover augmentations costs; the Financial-Based CRAC (or "FB CRAC") designed to cover net revenue, and the Safety-Net CRAC (or "SN CRAC"), available if there were a likelihood of missing a treasury or other creditor payment.

The CRACs were created to allow the BPA to address any financial shortfalls without having to raise base rates. In par-

ticular, the CRACs were intended to increase the BPA's Treasury Payment Probability to what it considered acceptable levels. FERC granted interim approval of the CRAC proposal on September 28, 2001 and final approval on July 21, 2003. 104 FERC ¶ 61,093 (2003).

When triggered, the Safety-Net CRAC allowed "an upward adjustment to posted power rates subject to the FB CRAC by modifying the FB CRAC parameters." Under the GRSP, the Safety-Net CRAC would be available if the Administrator determined that, after implementation of the Financial-Based CRAC and any adjustments, either of the following conditions existed:

- The BPA forecasts a fifty percent or greater probability that it will nonetheless miss its next payment to Treasury or other creditor, or

- The BPA has missed a payment to the Department of the Treasury or has satisfied its obligation to the Department of the Treasury but has missed a payment to any other creditor.

Under the supplemental proposal, once the BPA Administrator determined that these conditions existed, the BPA would "propose changes to the FB CRAC parameters that will, to the extent market and other risk factors allow, achieve a high probability that the remainder of Treasury payments during the FY 2002-2006 rate period will be made in full." In determining its initial proposal, the BPA was to "give priority to prudent cost management and other options that enhance Treasury Payment Probability while minimizing changes to the FB CRAC."

When the Administrator determined that the Safety-Net CRAC had been triggered, the BPA would be required to send written notification to customers that purchase power under rates subject to the Financial-Based CRAC and to other inter-

ested parties. The notice was required to "the documentation used by the BPA to determine that the SN CRAC has triggered, the amount of any forecast shortfall, and the time and location of a workshop on the SN CRAC." The scheduled workshops are to discuss "the cause of shortfall, and any proposed changes to the FB CRAC that will achieve a high probability that the remainder of Treasury payments . . . will be made timely."

Additionally, "[a]s soon as practicable after a determination," the BPA was required to publish "a Federal Register Notice initiating an expedited hearing process to be conducted in accordance with Section 7(i) of the Northwest Power Act." The hearing was required to be completed within forty days of publication of the notice.

The BPA experienced continued financial problems in the winter of 2003. Due to "lower than expected prices and less than expected hydro production," the BPA ended up "selling less energy and at lower prices than forecasted in the Supplemental Proposal." Under the GRSP financial test, the Administrator determined that the BPA had less than a fifty percent probability of making the next Treasury payment, due October 1, 2003. On February 7, 2003, the BPA Administrator commenced an emergency rate adjustment pursuant to the financial test in the Safety-Net CRAC provisions. The BPA issued a letter to "interested parties and customers" informing them of the trigger determination; the letter "included a table summarizing the documentation used by the BPA to determine that the SN CRAC had triggered, the amount of the forecasted shortfall, and the time and location for a workshop on the SN CRAC."

Pursuant to the GRSP, the BPA conducted workshops in February 2003 to explain the trigger determination. In March, the BPA published a Federal Register Notice of "Proposed Safety-Net Cost Recovery Adjustment Clause Adjustment to 2002 Wholesale Power Rates." 68 Fed. Reg. 12048 (2003).

The BPA held full evidentiary hearings and allowed a comment period.

In June 2003, the BPA published its "Administrator's Final Record of Decision" ("Final ROD") for the Safety-Net CRAC. The Final ROD contains the BPA analysis and conclusions based on the evidentiary record compiled, with respect to the adoption of the Safety-Net CRAC. Subsequently, the BPA filed its Safety-Net CRAC rate adjustment proposal and record with FERC on July 29, 2003, along with a request for interim and final approval effective October 1, 2003. 105 FERC ¶ 61,006 ¶¶ 2, 3 n.4 (2003). The effect of the Safety-Net CRAC would be to increase the BPA's power rates substantially.

The petitioners in these consolidated petitions for review are various public utilities and private utility consumers who challenge the BPA's Final ROD approving the Safety-Net CRAC. They contend that the BPA Administrator was not entitled to impose the Safety-Net CRAC because neither of the two predicate conditions existed. Respondents concede that the BPA had not missed any payments that would cause the trigger. The Petitioners argue that the other predicate condition — the BPA forecast of a fifty percent probability that it would miss its next payment to the Department of the Treasury — was fundamentally flawed. Petitioners claim that the BPA acted arbitrarily and capriciously in adopting the Safety-Net CRAC because the BPA had sufficient financial resources to make its next Treasury payment, but improperly chose to exclude sources of revenue such as bond refinancing.

On judicial review under the Administrative Procedures Act, we may grant a petition for review from a final decision of the BPA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review subject matter jurisdiction *de novo*. *Chang v. United States,* 327 F.3d 911, 922 (9th Cir. 2003).

## II

The threshold question is whether we have jurisdiction over the consolidated petitions for review. The BPA contends that the Administrator's decision to trigger the Safety-Net CRAC is not subject to judicial review until FERC confirms and approves the rate,[1] reasoning that the final agency action in this instance rests with FERC. We agree and conclude that we lack appellate jurisdiction because the Final ROD was not the final rate determination and therefore, not the final agency action.

## A

**[1]** Under the Northwest Power Act, we have original jurisdiction for all cases brought challenging actions under the Project Act, 16 U.S.C. §§ 832 et seq. *Id.* § 839f(e)(5). The act vests us with exclusive jurisdiction for review of final actions and decisions of the BPA Administrator. *Pub. Util. Dist. No. 1 of Clark County v. Johnson*, 855 F.2d 647, 648 (9th Cir. 1988). Our jurisdiction is limited to "[s]uits to challenge the constitutionality of [the Project Act], or any action thereunder, final actions and decisions taken pursuant to this [Act] by the Administrator or the Council, or the implementation of such final actions." *Id.* The statute delineates eight actions considered "final actions subject to judicial review." 16 U.S.C. § 839f(e)(1). This list includes "final rate determinations," which are deemed final only "upon confirmation and approval by the Federal Energy Regulatory Commission." *Id.* § 839f(e); *Cent. Lincoln Peoples' Util. Dist.*, 735 F.2d at 1109.

**[2]** Because the BPA's decision to trigger the Safety-Net CRAC is ultimately subsumed into the rate subject to FERC

---

[1]Final confirmation did in fact occur on May 10, 2004. 107 FERC ¶ 61,138 (2004). It is the subject of a separate petition for review pending before this Court.

approval, this statutory scheme would seem to present a fairly straightforward administrative process for review of the BPA's trigger determination. However, FERC does not have the authority to review the BPA's initial trigger decision. Although FERC must approve all rate changes before they become final, FERC's power to review the BPA proposals is limited: It can affirm or remand the rates, but cannot modify them. 16 U.S.C. §§ 839e(a), 839e(k); 107 FERC ¶ 61,138 ¶ 23. FERC has described its role in the BPA ratemaking as that "of an appellate body," whose "function is to determine from the record before it whether 'due process requirements have been met and [whether] the Administrator's program of rate schedules and the decision of [the Assistant Secretary] are rational and consistent with the statutory standards.' " *Aluminum Co. of Am. v. BPA*, 903 F.2d 585, 592-93 (9th Cir. 1989) (quoting *United States v. City of Fulton*, 475 U.S. 657, 663 (1986)) (alterations in original).

The basis of the Commission's review of regional power and transmission rates is restricted to whether the proposed rates meet the three specific requirements of Section 7(a)(2), namely that they:

> (A)   are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,

> (B)   are based upon the Administrator's total system costs, and

> (C)   insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.

16 U.S.C. § 839e(a)(2).

FERC reviews non-regional, non-firm rates to determine whether such rates comply with the statutory mandates of the Project Act, the Flood Control Act of 1944, and the Transmission System Act. *Id.* § 839e(k). These statutes require BPA "to design its non-regional, non-firm rates: (1) to recover the cost of generation and transmission of such electric energy, including the amortization of investments in the power projects within a reasonable period; (2) to encourage the most widespread use of Bonneville power; and (3) to provide the lowest possible rates to consumers consistent with sound business principles." 107 FERC ¶ 61,138 ¶ 22.

**[3]** Given these limitations, the Petitioners quite correctly point out that FERC's rate review will not provide them with an opportunity to challenge the BPA's trigger decision during FERC's review. However, the absence of FERC review does not preclude judicial review of the BPA's trigger determination after final FERC action. Indeed, the BPA concedes that the petitioners have the full right to judicial review of its trigger decision as part of the petition for review of the ultimate FERC rate decision. However, because the trigger determination was a component of the rate, it is not subject to judicial review until final agency action with respect to the rate. *See Pub. Util. Comm'r of Oregon v. BPA*, 767 F.2d 622, 629 (9th Cir. 1985) (noting that challenges to the BPA's rate-making process not subject to FERC review may still be raised on judicial review of final FERC rate decision, but cannot be raised in an interlocutory petition for review). In sum, the petitions before us are not ripe for review, but are a proper part of a petition for review of the final FERC rate decision.

B

**[4]** The petitioners contend that we have appellate jurisdiction pursuant to our "catchall" jurisdiction under the Northwest Power Act, which provides that "[n]othing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator." 16

U.S.C. § 839f(e)(3). The Northwest Power Act does not delineate what constitutes a "final action" under this section. Therefore, the courts have been left to define the term. In doing so, we have looked to the "more general doctrine of finality in administrative agency law." *See Puget Sound Energy, Inc. v. United States*, 310 F.3d 613, 624 (9th Cir. 2002). The finality doctrine is "concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 828 (9th Cir. 2002) (quoting *Darby v. Cisneros*, 509 U.S. 137, 144 (1993)).

**[5]** The Supreme Court provided guidance in this determination in *Bennett v. Spear*, 520 U.S. 154 (1997). In *Bennett*, the Supreme Court held that an agency action is considered "final" when the two sets of conditions are satisfied. *Id.* at 177-78. "First, the action must mark the 'consummation' of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature." *Id.* (citations omitted). Secondly, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' " *Id.* at 178 (citations omitted). As the Supreme Court has stated, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

In applying these principles, we have determined that certain factors provide an indicia of finality, such as "whether the [action] amounts to a definitive statement of the agency's position, whether the [action] has a direct and immediate effect on the day-to-day operations of the party seeking review, and whether immediate compliance [with the terms] is expected." *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 909 (9th Cir. 2003) (citing *Mt. Adams Veneer Co. v. United States*, 896 F.2d 339, 343 (9th Cir. 1990) (citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 239-40 (1980))).

**[6]** The decision by the BPA Administrator to trigger the Safety-Net CRAC rate adjustment process fails the first prong of the *Bennett* test of finality, in that it does not "mark the 'consummation' of the agency's decisionmaking process," but is merely the beginning of the decision-making process. "An interlocutory order or decree is one which does not finally determine a cause of action but only decides some intervening matter pertaining to the cause, and which requires further steps to be taken in order to enable the court to adjudicate the cause on its merits." *Dalton Equip. Co. v. Brown*, 594 F.2d 195, 197 (9th Cir. 1979).

In the Final ROD, the BPA represented that "[t]he trigger determination for the SN CRAC is purely procedural." As the Final ROD explains, "[t]he trigger determination does not propose an SN CRAC or establish an SN CRAC." Instead, the trigger determination only initiates the process. The Administrator considered the Safety-Net CRAC process to be comprised of three phases, as delineated in the GRSP. The trigger determination constitutes the first phase. The second phase is the "SN CRAC Notification Process," which is "intended to inform customers and interested third parties of the Administrator's determination, and the basis for it." The third phrase is "SN CRAC Hearing Process," which is governed by the procedural requirements of § 7(i). After the § 7(i) evidentiary hearing, which must be completed within forty days, the BPA must submit the required documentation, including the administrative record to FERC. Only after FERC's confirmation and approval are rate determinations deemed final. 16 U.S.C. § 839f(e)(4)(D); *Cent. Lincoln Peoples' Util. Dist.*, 735 F.2d at 1109.

Petitioners argue, with much justification, that the trigger decision is a discrete decision that has immediate financial impact. However, the fact that a statement may be definitive on some issue is insufficient to create a final action subject to judicial review. In *Standard Oil*, for example, Standard Oil Company of California ("Socal") brought an action against

the FTC for issuing a complaint averring that the Commission had "reason to believe" Socal was violating the Federal Trade Commission Act. 449 U.S. at 234-35. The court found that the FTC's averment of "reason to believe" was not a definitive statement of position, but "represent[ed] a threshold determination that further inquiry is warranted and that a complaint should initiate proceedings." *Id.* at 242. As the court explained:

> To be sure, the issuance of the complaint is definitive on the question whether the [FTC] avers reason to believe that the respondent to the complaint is violating the Act. But the extent to which the respondent may challenge the complaint and its charges proves that the averment of reason to believe is not "definitive" in a comparable manner to [other cases]. . . . [T]he averment of reason to believe is a prerequisite to a definitive agency position on the question whether Socal violated the Act, but itself is a determination only that adjudicatory proceedings will commence.

*Id.* at 241.

[7] Although it is the predicate act for rate readjustment, the trigger determination itself has no final consequences. The trigger decision only determines whether a hearing will or will not occur. Like the complaint at issue in *Standard Oil*, the determination "[s]erv[es] only to initiate the proceedings." *Id.* at 242. As the BPA noted in the Final ROD, "[t]he actual determination of whether the BPA will have an SN CRAC and, if so, the nature of the SN CRAC rate adjustment, is determined in the section 7(i) hearing." Any change in actual rate only occurs after being submitted to and approved by FERC. Because it is not an actual rate decision, the BPA Administrator is allowed, and in fact required, to "make a decision on the trigger determination in the absence of a formal evidentiary record." The BPA explains that "[t]he

requirements for making the trigger determination are very limited, which is perfectly consistent with the nature of the trigger determination . . . [which] has no substantive effect on any customer or interested party."

In the real world, of course, the trigger determination has economic consequences — sometimes profound consequences — because companies must take it into consideration when negotiating power contracts, particularly long-term power contracts. Nonetheless, the companies have a right of judicial review at the conclusion of FERC proceedings and do not waive any of their objections to the predicate determinations by failing to seek judicial review at an earlier stage.

## III

**[8]** For these reasons, we dismiss the petitions for lack of jurisdiction. We need not, and do not, reach any other issue raised by the parties. Each party shall bear its own costs.

**PETITION DISMISSED.**